# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE AMC ENTERTAINMENT HOLDINGS, INC. STOCKHOLDER LITIGATION

)
)
)

Consol. C.A. No. 2023-0215-MTZ

## OPINION

Date Submitted: June 30, 2023
Date Decided: July 21, 2023

Gregory V. Varallo, Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware; Mark Lebovitch, Edward Timlin, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, New York, New York; Michael J. Barry, Kelly L. Tucker, Jason M. Avellino, GRANT & EISENHOFER, P.A., Wilmington, Delaware; Thomas Curry, SAXENA WHITE P.A., Wilmington, Delaware, *Attorneys for Plaintiffs Allegheny County Employees' Retirement System and Anthony Franchi.*

Raymond J. DiCamillo, Kevin M. Gallagher, Matthew W. Murphy, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; John A. Neuwirth, Joshua S. Amsel, Tanner S. Stanley, WEIL, GOTSHAL & MANGES LLP, New York, New York, *Attorneys for Defendants AMC Entertainment Holdings, Inc., Adam M. Aron, Denise Clark, Howard W. Koch, Jr., Kathleen M. Pawlus, Keri Putnam, Anthony J. Saich, Philip Lader, Gary F. Locke, Lee Wittlinger, and Adam J. Sussman.*

**ZURN, Vice Chancellor.**

Common stockholders of AMC Entertainment Holdings, Inc. ("AMC" or the "Company") brought direct claims on behalf of a putative class of common stockholders. The plaintiffs sought injunctive relief to stop the Company from holding a special meeting at which the common stockholders, together with holders of fractional units of blank check preferred stock, would vote upon two charter amendments. The first amendment would authorize more common stock, which would trigger the conversion of those fractional units into shares of common stock. The second would effect a reverse stock split.

The amendments were certain to pass because the AMC board of directors (the "Board") had used its blank check authority to issue units representing fractional shares of preferred stock, and imbued those units with dispositive voting power. Those units have a mirrored voting feature under which any uninstructed units vote in proportion to the instructed units. The mirrored voting feature enables the preferred units to dictate the outcome of any vote on which the common shares and the preferred units vote together. During the leadup to the special meeting, the Board sold a large block of preferred units to an institutional investor who promised to vote in favor of the amendments. That promise, together with the mirrored voting feature, ensured the amendments' approval by a combined vote of the preferred units and common shares.

1

The plaintiffs asserted two claims on behalf of the common stockholders. First, they contended members of the Board breached their fiduciary duties by issuing and "weaponizing" the preferred units, thereby interfering with the common stockholders' voting rights. Second, they contended AMC was statutorily required to provide the common stockholders with a class vote on the creation of the preferred units, and failed to do so.

The plaintiffs sought an expedited hearing on a preliminary injunction that would prevent the special meeting from taking place until after the Court entered judgment on the plaintiffs' claims. Before the preliminary injunction hearing, the plaintiffs negotiated a settlement with the defendants on behalf of the class of common stockholders the plaintiffs purport to represent. The settlement consideration consists of additional shares of common stock awarded to current common stockholders. In return, the plaintiffs and defendants suggest the class of common stockholders should release claims they hold as common stockholders as well as any claims they may hold as owners of preferred units.

Under Delaware law, the Court must review all class action settlements to ensure that (1) the representative plaintiffs negotiated a deal for the class that falls within a range of reasonable results that a disinterested person could accept, and (2) the representative plaintiffs satisfied the requirements of due process such that the settlement can bind absent class members to the deal the representative plaintiffs

2

negotiated. The presentation of a settlement involves a series of prescribed steps designed to permit briefing by the parties in support of the settlement, and to provide notice to stockholders so they can object.

AMC's stockholder base is extraordinary. It includes a great number of human owners who care passionately about their stock ownership and the Company. Many of them are connected to each other online. When notice went out to AMC stockholders, the reaction was unprecedented. The Court received more than 3,500 communications from approximately 2,850 purported stockholders.

To ensure that the stockholder submissions received careful review, the Court appointed a special master to review them and make recommendations. After completing her review, the special master filed a report recommending how the Court should weigh the objections against the terms of proposed settlement. The objecting stockholders and parties received the opportunity to take exception to that report. Then the Court held a hearing where the parties and objectors presented their positions on the proposed settlement.

At this juncture, the Court's only task is to approve or reject the proposed settlement. The focus of the settlement is on the claims presented in this case. The Court cannot address issues that do not pertain to the fairness of the settlement. Such issues raised by AMC stockholders include theories about synthetic shares, Wall Street corruption, dark pool trading, insider trading, and RICO violations, and a

3

request for a share count. The Court's role is limited to considering settlement-specific issues, like the strength of the plaintiffs' claims, the consideration the class would receive, and the scope of the release the class would give in exchange for that consideration.

Citing AMC's financial situation, the parties have sought to present their settlement for approval on a compressed timeframe. Even moving quickly, the Court must ensure that the proposed settlement is fair and fulfills the principles of due process. To cut to the chase, the settlement cannot be approved as submitted.

The release purports to release not only claims associated with the common stock, but also claims associated with preferred interests that common stockholders might also hold. The release cannot properly extend to those latter claims, because the plaintiffs were not appointed as fiduciaries for the holders of preferred interests and did not bring claims based on preferred rights. The plaintiffs only sued on behalf of a putative class of common stockholders, and only asserted claims based on the voting rights of common stockholders. They can agree to a release that encompasses the claims they asserted, and claims that the class holds and that arise out of the same factual predicate.

The settlement purports to release claims that do not arise out of the same factual predicate as the claims asserted in this action. The factual predicate on which the plaintiffs' claims are based depicts the plight of the common stockholders who

4

have been harmed by the issuance and voting power of the preferred units. The factual predicate from the standpoint of the preferred units is the polar opposite. True, the plaintiffs allege a unitary timeline of events that starts from AMC's creation of preferred units and ends with the proposals at the special meeting. But those events affected common stockholders and the preferred units in opposite ways, particularly as to their voting rights and equity in AMC.

More fundamentally, the direct claims arising out of preferred interests are appurtenant to those interests, and can be represented and released only by preferred unitholders. The plaintiffs, as common stockholders representing common stockholder class members, cannot release direct claims appurtenant to the preferred units. This is so even if some common stockholder class members happen to also hold preferred units.

Finally, the release of claims arising out of preferred interests is not supported by consideration. Awarding more shares to common stockholders necessarily comes at the expense of preferred units; the settlement consideration harms preferred unitholders.

The settlement therefore cannot be approved as presented. This decision nevertheless takes the additional step of ruling on the various exceptions to the special master's report. They are dismissed. The Court thanks the special master and her team for their outstanding work.

## I.  BACKGROUND[1]

What follows are not formal factual findings, but rather how the Court regards the record for purposes of evaluating the proposed settlement (the "Proposed Settlement").

[1] Citations in the form of "D.I. —" refer to docket items in *In re AMC Entertainment Holdings, Inc. Stockholder Litigation*, C.A. No. 2023-0215-MTZ (Del. Ch.), formerly *Allegheny County Employees' Retirement System v. AMC Entertainment Holdings, Inc., et al.*, C.A. No 2023-0215-MTZ (Del. Ch.).  Citations in the form of "2023-0216, D.I. —" refer to docket items in *Usbaldo Munoz, et al. v. Adam M. Aron, et al.*, C.A. No. 2023-0216-MTZ (Del. Ch.).  Citations in the form of "Hr'g Tr. —" refer to the settlement hearing held on June 29 and 30, 2023.  D.I. 578; D.I. 579.

The facts are drawn from the allegations of the Verified Class Action Complaint Seeking Declaratory, Injunctive, and Equitable Relief filed in this action (the "Allegheny complaint"), the Verified Stockholder Class Action Complaint filed in *Usbaldo Munoz, et al. v. Adam M. Aron, et al.* (the "operative complaint"), "from the affidavits and supporting documents submitted in connection with the application for court approval," and public filings.  D.I. 1 [hereinafter "Non-Op. Compl."]; 2023-0216, D.I. 1 [hereinafter "Op. Compl."]; *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1030 (Del. Ch. 2015); *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("Applying [Delaware] Rule [of Evidence] 201, Delaware courts have taken judicial notice of publicly available documents that 'are required by law to be filed, and are actually filed, with federal or state officials.'" (quoting *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007))); *accord Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004) (holding that the court may take judicial notice of public documents such as SEC filings that are required by law to be filed).

On March 2, I entered an order consolidating the two matters into the instant action and designated "[t]he *Munoz* Complaint" operative; AMC is not a defendant in the operative complaint.  D.I. 20 ¶ 7.  I also asked counsel to confirm "whether the statutory claim asserted in the *Allegheny* Action" would be included in the consolidated action.  *Id.* ¶ 8.  On March 13, the plaintiffs' counsel filed a letter representing to the Court that the statutory claim "**will**" be included as a basis for Plaintiffs' motion for a preliminary injunction in this consolidated action."  D.I. 34 at 1–2 (double emphasis in original).  The plaintiffs never filed a consolidated complaint.  Accordingly, I will draw facts from both complaints, and I will also assume for the limited purposes of this opinion that AMC Entertainment Holdings, Inc. is a "defendant," based on the inclusion of "the statutory

**A.      AMC Sells Stock To Raise Capital And Seeks To Increase Its Authorized Shares Of Common Stock.**

AMC is a movie theater company; the COVID-19 pandemic was disastrous for its revenue. To stay afloat, between the end of 2020 and the middle of 2021, AMC sold nearly all of its available common shares in a remarkable connection with retail investors, i.e., individuals rather than institutions.[2] By April 2021, approximately 85% of AMC's stockholders were retail investors.[3] As of March 2021, AMC had issued and outstanding 450,156,186 common shares out of a total of 524,173,073 authorized in its certificate of incorporation (the "Certificate").[4]

---

claim asserted in the *Allegheny* Action" and counsel for the defendants having entered their appearance on AMC's behalf after the Court consolidated the actions. D.I. 24.

[2] AMC's Certificate provided the Company with authority to issue up to 650,000,000 shares, consisting of (i) 524,173,073 shares of Class A common stock, (ii) 75,826,927 shares of high-voting Class B common stock and (iii) 50,000,000 shares of preferred stock. Non-Op. Compl. ¶ 26. When this opinion refers to "common shares" or "common stock," it refers only to Class A common stock. *See, e.g.*, D.I. 165 [hereinafter "Stip."] at Recitals ¶ A (defining "Common Stock" to mean Class A common stock); D.I. 185, Ex. 1 [hereinafter "Notice"] at 1 (same); D.I. 185 [hereinafter "Sched. Ord."] ¶ 3 (same).

[3] Op. Compl. ¶ 6.

[4] *Id.* ¶ 8; *see also id.* ¶ 61 ("As of August 3, 2020, there had been 109,319,377 shares of common stock issued and outstanding. By June 2, 2021, this number had ballooned to 501,780.240. The total authorized under the Certificate was 524,173,073."); D.I. 200, Defendants' Brief in Support of Proposed Settlement [hereinafter "DOB"], at 8 (stating the Company had "only 63,096,124 shares of authorized but unissued shares of Common Stock available by March 3, 2021"); Non-Op. Compl. at 13 n.3 ("As of December 28, 2020, there were 164,298,527 shares of Class A common stock outstanding, 51,796,784 shares of Class B common stock outstanding and no shares of preferred stock outstanding. The Charter required the Company to reserve and keep available a number of authorized but unissued shares of Class A common stock sufficient for conversion of all outstanding shares of Class B common stock into shares of Class A common stock.").

To continue to capitalize on the retail demand for AMC common stock, AMC's Board sought to increase the number of authorized common shares. On January 27, 2021, the Board adopted a resolution proposing to amend AMC's Certificate to increase the total number of authorized common shares by 500,000,000 shares to 1,024,173,073 shares, and resolved to submit that proposed amendment to a stockholder vote at the Company's May 4, 2021, annual meeting (the "2021 Annual Meeting").[5] On March 19, the Company filed a proxy statement through which the Board solicited stockholder support of that proposed amendment.[6] Stockholders appeared unsupportive, so on April 27, the Board determined not to seek stockholder approval of the proposed amendment.[7] On May 4, the Board postponed the 2021 Annual Meeting until July to try to garner stockholder support to amend the Certificate. The Board also amended the Company's bylaws to lower the quorum requirement from a majority to one-third of the issued and outstanding stock entitled to vote at the meeting.[8]

---

[5] *Id.* ¶ 35; Op. Compl. ¶ 62.

[6] Op. Compl. ¶ 63; *id.* ¶ 64 (stating the March 19 proxy contemplated an increase of 500,000,000 shares to a total of 1,024,173,073 shares of common stock).

[7] *Id.* ¶ 67; Non-Op. Compl. ¶ 39; D.I. 206, Plaintiffs' Opening Brief in Support of Settlement, Award of Attorneys' Fees and Expenses, and Incentive Awards [hereinafter "POB"] at 13.

[8] Op. Compl. ¶ 71.

On June 3, the Company filed a preliminary proxy statement for its then-delayed annual meeting, disclosing the Board had approved a proposal to amend the Certificate to increase the total number of authorized common shares by 25,000,000 shares to 549,173,073 shares, which would be put to a stockholder vote at the rescheduled 2021 Annual Meeting.[9] Once again, the electorate was not on board.[10] On July 6, AMC announced that it would no longer seek stockholder approval for that proposed amendment, and withdrew it from the agenda for the 2021 Annual Meeting.[11]

Retail investors, like those that comprise the majority of AMC's stockholder base, "traditionally have a poor record of attending and voting at meetings."[12] Commentators have described this phenomenon as "rational apathy."[13] When the

---

[9] Non-Op. Compl. ¶ 41; AMC Entertainment Holdings, Inc., Preliminary Proxy Statement (Schedule 14A) (June 3, 2021).

[10] POB at 14 & n.19 (citing POB, Ex. 23 at AMC_00021609, and POB, Ex. 26 at AMC_00026254, and POB, Ex. 30 at AMC_00033798, and POB, Ex. 32 at AMC_00033845).

[11] Op. Compl. ¶ 74; Non-Op. Compl. ¶ 45.

[12] Op. Compl. ¶ 18; Non-Op. Compl. ¶ 80 (discussing low voter turnout of AMC's retail base).

[13] *See, e.g.*, Bernard S. Black, *Shareholder Passivity Reexamined*, 89 MICH. L. REV. 520, 584–91 (1990) (discussing rational apathy of retail investors); Christopher Gulinello, *The Retail-Investor Vote: Mobilizing Rationally Apathetic Shareholders to Preserve or Challenge the Board's Presumption of Authority*, 2010 UTAH L. REV. 547, 573 (2010) (same); Kobi Kastiel & Yaron Nili, *In Search of the "Absent" Shareholders: A New Solution to Retail Investors' Apathy*, 41 DEL. J. CORP. L. 55, 60–61 (2016) ("However, despite the importance of voting, most retail investors are rationally apathetic. A diversified investor, who holds a small stake in a large public company, knows that her

Board lowered the quorum necessary for a stockholder meeting, the Board cited the fact that "nearly 85% of AMC's stock is held by retail investors," and "obtaining a quorum this year has proven challenging."[14] By May 17, AMC's proxy advisor was suggesting alternative voting structures to AMC and its counsel such as "[d]iscretionary voting – where brokers will vote any uninstructed shares with management's recommendations" and "[p]roportionate voting – where brokers will vote any uninstructed shares in the same proportion that their instructed shares were voted."[15] Even with these alternative structures, the proxy advisor suggested the vote cast split might be "51.11% FOR & 48.89% against," but "if the retail FOR vote moves to 26.5% or below, . . . the advantage disappears."[16]

---

vote probably will not affect the voting outcome. She, therefore has very little incentive, if at all, to invest time and efforts in the costly process of collecting information and studying the firm's affairs in order to make an intelligent voting decision regarding the election of directors or other corporate matters. For such a shareholder, it is simply economically rational to stay uninformed and not to vote at all. Investors' rational apathy, which is a natural result of the dispersion of ownership and diversification of investor portfolios, has been a long-standing problem of public firms." (footnotes omitted)).

[14] POB, Ex. 7 at AMC_00004343; *id.* at AMC_00004350 ("WHEREAS, the Corporation's stockholder base has become more diverse with a large number of retail stockholders with small shareholdings making it more difficult to obtain the necessary quorum; and WHEREAS, the Board has determined that it is in the best interests of the Corporation and its stockholders to reduce the amount of stock necessary to constitute a quorum at meetings of stockholders while still ensuring meaningful participation by stockholders.").

[15] POB, Ex. 20 at AMC_00019707 (emphasis omitted).

[16] *Id.* at AMC_00019708.

Without the ability to authorize more shares, AMC could not raise capital by issuing more common stock. AMC developed an alternative.[17]

### B. AMC Creates The APEs.

In addition to common stock, AMC's Certificate authorized fifty million shares of preferred stock. None had been issued.[18] AMC and its advisors decided that selling preferred stock could raise capital and that the votes associated with the preferred stock could carry the Certificate amendment.[19] On July 28, 2022, after months of discussions, the Board approved the creation of AMC Preferred Equity

---

[17] DOB at 6 (noting that "AMC's net loss [for 2022] remained just shy of $1 billion"); *id.* at 8–9; *see also* POB at 14 & n.21 (citing POB, Ex. 8); Hr'g Tr. 23.

[18] AMC Entertainment Holdings, Inc., Registration Statement (Form S-3) (Dec. 30, 2020), Ex. 3.1, Third Amended and Restated Certificate of Incorporation of AMC Entertainment Holdings, Inc., at art. IV(A)(iii) (authorizing issuance of "50,000,000 shares of Preferred Stock"); *see also* AMC Entertainment Holdings, Inc., Annual Report (Form 10-K) (Feb. 28, 2023), Ex. 4.5, Description of the Registrant's Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934 ("Our authorized capital stock consists of 524,173,073 shares of Class A common stock, par value $0.01 per share ('Class A common stock') and 50,000,000 shares of preferred stock, par value $0.01 per share, of which 10,000,000 have been designated as Series A Preferred Stock. As of December 31, 2022, there were 516,778,945 shares of Class A common stock outstanding and 7,245,871 shares of Series A Convertible Participating Preferred Stock outstanding, represented by 724,587,058 AMC Preferred Equity Units.").

[19] *See* POB at 16; POB, Ex. 20; *see also* Op. Compl. ¶ 93 ("On July 28, 2022, the full Board took its first steps [to] dilute the Common Stock through an abusive 'blank check' preferred stock issuance."); *id.* ¶ 102 ("Thus, as long as more APEs vote for a charter amendment than against it, the proposal will be far more likely (and perhaps assured) to pass."); Non-Op. Compl. ¶ 48 ("Instead of valuing and listening to the concerns and wishes of the common stockholders, [in summer 2022] the Board began implementing a plan to dramatically reduce the voting influence of the company's existing stockholders so that it could force through the sought-after increase in the authorized share count."). Documents indicate that AMC CEO Adam Aron viewed the APEs as an important tool for AMC to pay down debt and to "avoid any future liquidity traps." POB, Ex. 22 at AMC_00021432.

11

Units ("APEs" or "APE units").[20]  Each APE is a depositary receipt representing an interest in 1/100th of a share of the Company's Series A Convertible Participating Preferred Stock.[21]  Each share of preferred stock automatically converts into 100 shares of common stock as soon as AMC has enough authorized common shares to effectuate the conversion.  That makes each APE automatically convertible into one share of common stock.[22]

On August 4, AMC announced it would issue one APE as a special dividend for each share of Class A common stock outstanding as of the established record

---

[20] POB at 14–18.

[21] *E.g.*, Notice ¶ 8.

[22] POB, Ex. 10, Meeting Materials for July 28, 2022 Meeting of the Board of Directors of AMC Entertainment Holdings, Inc., at AMC_00005215; *id.* at AMC_00005216 ("Each Preferred Equity Unit is convertible into a common share subject to the approval of shareholders to increase the authorized common share capital of AMC such that (a) there are sufficient authorized common shares for the conversion, and (b) there is sufficient remaining authorized common share capital, after the conversion, to allow AMC to continue to raise common equity capital in the future."); *id.* at AMC_00005218 ("Each APE will automatically convert into common stock if and when AMC receives shareholder approval to authorize more common stock[.]"); DOB, Ex. O, AMC Entertainment Holdings, Inc., Registration Statement (Form 8-A) (Aug. 4, 2022) [hereinafter "Aug. 4, 2022 Form 8-A"] ("Each AMC Preferred Equity Unit, by virtue of its interest in the underlying Preferred Stock:  is automatically convertible into one (1) share of Common Stock upon effectiveness of the Common Stock Amendment (as defined below), subject to any adjustments described in the Certificate of Designations.  Upon effectiveness of the Common Stock Amendment, each share of Preferred Stock will convert into one hundred (100) shares of Common Stock and each AMC Preferred Equity Unit in turn will represent an interest in one (1) share of Common Stock and such shares of Common Stock will be distributed upon conversion to holders of the AMC Preferred Equity Units on a one-to-one basis, subject to the terms described in the Deposit Agreement and any adjustments described in the Certificate of Designations; . . . ."); *see also* Op. Compl. ¶¶ 13, 30, 99 (discussing the APEs' conversion rights).

12

date.[23] The Company told stockholders that APEs had the same voting power as common shares (i.e., one vote each).[24] AMC did not prominently disclose that pursuant to an August 4 deposit agreement (the "Deposit Agreement"), the Company's transfer agent[25] was required to vote uninstructed APEs proportionally with instructed APEs.[26] Proportionate voting for uninstructed APEs pursuant to the Deposit Agreement meant that APEs as a class would command greater voting power at a meeting than common shares as a class, because all of the APEs would be deemed present and voting at any meeting, even if voting instructions were only

---

[23] Aug. 4, 2022 Form 8-A. The August 4 Registration Statement and Form 8-K indicate the record date will be August 15, but the "Frequently Asked Questions" appended to the August 18 Form 8-K states the record date will be August 19. *Compare id.* ("On August 4, 2022, AMC Entertainment Holdings, Inc., (the 'Company') declared a special dividend of one depositary share (an 'AMC Preferred Equity Unit') for each share of Class A common stock, par value $0.01 per share (the 'Common Stock') of the Company outstanding at the close of business on August 15, 2022." (emphasis omitted)), *and* AMC Entertainment Holdings, Inc., Current Report (Form 8-K) (Aug. 4, 2022) ("On August 4, 2022, the Company announced that its Board of Directors declared a special dividend of one AMC Preferred Equity Unit (an 'AMC Preferred Equity Unit') for each share of Common Stock outstanding at the close of business on August 15, 2022, the record date." (emphasis omitted)), *with* AMC Entertainment Holdings, Inc., Current Report (Form 8-K) (Aug. 18, 2022), Ex. 99.1, AMC Preferred Equity unit ("APE") Dividend Frequently Asked Questions [hereinafter "AMC FAQ"], at ¶ 4 ("To receive the dividend, you must own shares of common stock at the end of trading on Friday, August 19, 2022.").

[24] POB at 19.

[25] DOB, Ex. N, AMC Entertainment Holdings, Inc., Current Report (Form 8K/A) (Aug. 4, 2022), Ex. 4.1 [hereinafter "Deposit Agr."], at Recitals (defining "Depositary" as Computershare, Inc. and its affiliate, Computershare Trust Company, N.A.).

[26] POB at 19; Deposit Agr. § 4.5.

received for one APE. By contrast, shares of common stock would only be voted if voting instructions were received.

Consider an illustrative example. Assume 100 APEs were outstanding, and holders submitted instructions for 80 APEs, with 64 voted in favor of a proposal, and sixteen against. The remaining 20 would be deemed present and voted in proportion to voted units: 96 APEs would vote in favor of the proposal.[27] In contrast, common shares are only deemed present and entitled to vote if voting instructions are received. Uninstructed shares are deemed absent and treated as a non-vote. Assume 100 common shares were outstanding, and holders submitted instructions for 80 shares, with all 80 voted in favor of a proposal. The remaining 20 are not voted. Thus, there would be 96 APE votes and only 80 common votes.[28]

AMC announced that APEs would trade on the New York Stock Exchange under the symbol "APE" starting August 22.[29] In an August 18, 2022, FAQ, AMC

---

[27] Aug. 4, 2022 Form 8-A ("In the absence of specific instructions from holders of AMC Preferred Equity Units, the Depositary will vote the Preferred Stock represented by the AMC Preferred Equity Units evidenced by the receipts of such holders proportionately with votes cast pursuant to instructions received from the other holders of AMC Preferred Equity Units.").

[28] *See* DOB, Ex. X, AMC Entertainment Holdings, Inc., Current Report (Form 8-K) (Mar. 14, 2023) [hereinafter "Mar. 14, 2023 Form 8-K"] (disclosing proportional voting results).

[29] Op. Compl. ¶ 106; Aug. 4, 2022 Form 8-A.

said that while the APEs could convert into shares of common stock, it "did not currently expect AMC to make such a proposal anytime soon."[30]

In addition to the APEs distributed as a dividend to primarily retail common stockholders, AMC tried to sell APEs more broadly. On September 26, AMC disclosed it had entered into an equity distribution agreement with Citigroup Global Markets, Inc. to sell 425,000,000 APEs from time to time in at-the-market offerings.[31] This campaign was unsuccessful: by December, APEs were trading below one dollar per unit, forcing AMC to stop selling additional APEs on the open market.[32]

### C. The Board Pursues Conversion.

At a December 21 Board meeting, the Board approved two Certificate amendments and resolved to put them to a stockholder vote.[33] The amendments would: (i) increase the authorized number of shares of common stock to a number at least sufficient to permit the full conversion of APEs into common stock (the "Share

---

[30] D.I. 450, at Exhibit 2 to the Corrected Transmittal Affidavit of Thomas Curry in Support of Plaintiffs' Reply in Further Support of Settlement, Award of Attorneys' Fees and Expenses, and Incentive Awards [hereinafter "Izzo Obj."], at 5 (quoting AMC FAQ ¶ 1); AMC FAQ ¶ 3 ("However, we do not currently expect the AMC Board to make such a proposal any time soon.").

[31] POB at 19.

[32] Op. Compl. ¶ 119; POB, Ex. 13 [hereinafter "Dec. 21, 2022 Board Minutes"] at AMC_00005968.

[33] Dec. 21, 2022 Board Minutes at AMC_00005971 (resolving to amend the Certificate, pending stockholder approval).

Increase Proposal"); and (ii) effect a 1-for-10 reverse stock split of AMC equity (the "Reverse Split Proposal," and together with the Share Increase Proposal, the "Proposals").[34] Upon approval of the Share Increase Proposal and filing of the amendment with the Delaware Secretary of State, each APE would convert into one share of common stock (the "Conversion").[35] The Board specifically discussed how the Deposit Agreement increased the likelihood the Proposals would pass.[36]

At that same December 21 meeting, the Board approved the sale of $110 million APEs to Antara Capital LP ("Antara").[37] AMC and Antara entered into a "Forward Purchase Agreement," pursuant to which AMC would (i) sell 106,595,106 APEs to Antara for $75.1 million and (ii) purchase from Antara $100 million of the Company's 10%/12% Cash/PIK Toggle Second Lien Notes due 2026 in exchange for 91,026,191 APEs (the "Antara Transaction").[38] The Forward Purchase Agreement also contained lock-up restrictions that prevented Antara from selling,

---

[34] Op. Compl. ¶ 126; Dec. 21, 2022 Board Minutes at AMC_00005971.

[35] *See supra* note 22.

[36] Dec. 21, 2022 Board Minutes at AMC_00005968 ("Mr. Aron outlined the voting dynamics for the special shareholder meeting indicating that there were presently considerably more APEs in the float than common stock, . . . and that the non-voting APE shares would be voted proportionately rather than as 'no votes', all of which [sic] factors gave AMC a good chance to secure approval for conversion."); *id.* at AMC_00005971 (resolving to amend the Certificate, pending stockholder approval).

[37] Op. Compl. ¶ 120; Dec. 21, 2022 Board Minutes at AMC_00005969–70.

[38] Op. Compl. ¶ 125; Dec. 21, 2022 Board Minutes at AMC_00005968; DOB, Ex. R., AMC Entertainment Holdings, Inc., Current Report (Form 8-K) (Dec. 22, 2022) [hereinafter "Dec. 22, 2022 Form 8-K"].

transferring, or otherwise disposing of the APEs for at least ninety days.[39] Antara also purchased sixty million APEs at a price of $34.9 million through an at-the-market offering.[40] Antara agreed to vote all of its APE holdings in favor of the Proposals.[41] When approving the Antara Transaction, the AMC Board specifically noted that "AMC had a good chance to secure approval" of the Proposals, given that the APE unitholders would likely want to convert their units to common shares.[42]

The next day, AMC announced that it would hold a special meeting within ninety days for stockholders to vote on the Proposals (the "Special Meeting").[43] On February 7, AMC issued the APE units called for by the Antara Transaction.[44] Two days later, the Company waived the Forward Purchase Agreement's lock-up restrictions, permitting Antara to sell up to twenty-six million APEs ahead of the

---

[39] Dec. 22, 2022 Form 8-K.

[40] Op. Compl. ¶ 125; Dec. 21, 2022 Board Minutes at AMC_00005968; Dec. 22, 2022 Form 8-K.

[41] Op. Compl. ¶ 126; Dec. 22, 2022 Form 8-K; DOB, Ex. W, AMC Entertainment Holdings, Inc., Proxy Statement (Schedule 14A) (Feb. 14, 2023) [hereinafter "Feb. 14, 2023 Proxy"], at 6 ("On the Record Date, Antara Capital LP ([] 'Antara') owned and was entitled to vote an aggregate of 258,439,472 APEs, representing 17.8% of AMC's issued and outstanding shares of Common Stock and APEs (with each APE representing 1/100 of a share of Series A Preferred Stock), and plans to vote in favor of the Share Increase Proposal and the Reverse Split Proposal, and, if presented, we also anticipate they will also vote in favor of the Adjournment Proposal.").

[42] Dec. 21, 2022 Board Minutes at AMC_00005968.

[43] Op. Compl. ¶ 126.

[44] *Id.* ¶ 127.

Special Meeting.[45]  Since the record date for the Special Meeting was February 8, Antara could still vote any APEs that it sold.[46]  AMC did not disclose why it waived the lock-up.

On January 27, 2023, AMC filed its preliminary proxy statement for the Special Meeting.[47]  On February 14, AMC filed its definitive proxy statement and scheduled the Special Meeting for March 14.[48]  AMC disclosed that Antara held 258,439,472 APEs, representing approximately 27.8% of all outstanding APEs and approximately 17.8% of the Company's total voting power.[49]  AMC disclosed that Antara agreed to vote all of its APEs in favor of the Proposals.[50]  Antara's APE votes plus the mirrored-voting feature guaranteed the Proposals would pass.

All of these events affected the common stockholders and the APE unitholders differently.  Events that increased the APEs' relative voting power decreased the common's relative voting power.  The converse would be true as well, but the Board did not do anything to increase the common stockholders' relative voting power.

---

[45] *Id.* ¶ 128.

[46] *Id.*; POB at 24 (citing Feb. 14, 2023 Proxy at 2).

[47] AMC Entertainment Holdings, Inc., Preliminary Proxy Statement (Schedule 14A) (Jan. 27, 2023).

[48] Feb. 14, 2023 Proxy.

[49] *Id.* at 6.

[50] *Supra* note 41.

**D.    Litigation Ensues, The Vote Goes Forward, But The Proposals And Conversion Are Stayed.**

On February 20, the plaintiffs filed suit.  Allegheny County Employees' Retirement System ("Allegheny") filed a Verified Class Action Complaint Seeking Declaratory, Injunctive, and Equitable Relief against AMC and its Board alleging one count of breach of fiduciary duty and a second count for violation of 8 *Del. C.* § 242.[51]  That same day, Anthony Franchi (together with Allegheny, "Plaintiffs")[52] filed a Verified Stockholder Class Action Complaint against the Board alleging a single count for breach of fiduciary duty.[53]

Plaintiffs claim the defendants' issuance of APE units diluted the common stock's voting rights and economic value.[54]  The breach of fiduciary duty claim

---

[51] Non-Op. Compl.

[52] Usbaldo Munoz initially accompanied Franchi as a plaintiff.  But on May 26, 2023, Plaintiffs' counsel filed a combined motion moving to withdraw Munoz as a lead plaintiff and dismiss him from the action, which the Court granted on June 20.  D.I. 344; D.I. 507.

[53] Op. Compl.

[54] *E.g.*, Op. Compl. ¶ 156 ("There are questions of law and fact which are common to the Class, including, *inter alia*, whether:  . . . b.  Defendants violated their fiduciary duties by attempting to circumvent the franchise of the holders of the Common Stock; c.  Defendants violated their fiduciary duties by transferring economic value from members of the Class to Antara and other holders of APEs; . . . ."); *id.* ¶ 164 ("As alleged above, Defendants breached their fiduciary duties by creating and issuing Preferred Stock and APEs, entering into the Deposit Agreement with Computershare, and entering into the various agreements described herein with Antara, all of which are coercive, will sway the outcome of the Certificate Proposals, and are designed to circumvent the franchise rights of the Class.  The Board's actions are plainly intended to push through the Certificate Proposals notwithstanding the previous, repeated opposition of the Class."); *id.* ¶ 165 ("Moreover, as alleged above, by creating and issuing Preferred Stock and APEs, Defendants have caused

19

paints the creation, issuance, sale, and voting capabilities of APE units as the instrumentalities used to thwart the common stockholders' franchise, and the statutory claim contends the common stockholders should have voted as a class on the issuance of APE units.[55]

---

and will continue to cause significant dilution and economic harm to the Class. Moreover, if the Certificate Proposals carry and the APEs convert into shares of Common Stock, the Class will suffer further economic harm and dilution."); Non-Op. Compl. ¶ 103 ("Because the creation and issuance of the Preferred Stock was never submitted to a vote of, nor approved by, the Company's Class A common stockholders, the Preferred Stock was never properly authorized and is invalid."); *id.* ¶ 104 ("Because the Preferred Stock is invalid, the voting rights attached to each APE are likewise invalid."); *id.* ¶ 106 ("Plaintiff and the Class will be harmed if the Preferred Stock is not declared invalid and is permitted to be voted in connection with the pending Proposals."); *see also* Op. Compl. ¶¶ 4, 32, 93, 110, 151, 165.

[55] POB at 1 ("Defendants weaponized their legal power to issue 'blank check' preferred stock and massively diluted their common stockholders."); *id.* at 3 ("In mid-2022, management and their bankers at Citigroup conceived of a way to weaponize the Board's legal power to issue 'blank check' preferred stock with voting power amounting to 100 times that of Common Stock to override stockholders' voting rights in a manner that could not meet the equitable component of the 'twice tested' maxim of fiduciary conduct." (footnote omitted)); *id.* at 34 ("Defendants weaponized APEs' mirrored voting power and entered into the Antara Transaction to force through the Certificate Amendments. . . . While negotiating with Antara, Defendants knew that APE's mirrored voting power could be weaponized against holders of Common Stock."); *id.* at 37 ("Regardless of whether Defendants needed to act the way they did when they weaponized APEs and entered into the Antara Transaction . . . ."); *id.* at 39 ("The Board had the legal authority to create and issue them, and any claim concerning APEs did not arise until Defendants weaponized them alongside the Antara Transaction."); D.I. 450, Plaintiffs' Reply in Further Support of Settlement, Award of Attorneys' Fees and Expenses, and Incentive Awards [hereinafter "PRB"], at 1 ("While Plaintiffs believe the Court should reject Defendants' weaponization of the APEs and prevent fiduciaries from using such aggressively anti-stockholder tactics . . . ."); Op. Compl. at 36 ("The Board weaponizes APEs by giving Antara a massive windfall to buy APEs and vote for the twice rejected Charter Amendments" (capitalization altered)); *see also id.* ¶¶ 2, 12.

20

On February 27, the Court entered a stipulated order of expedition and status quo order that permitted AMC "to hold its March 14, 2023 special meeting and solicit and tabulate any votes in connection therewith," but prohibited the defendants from "amend[ing] AMC's certificate of incorporation as a result of any vote of shares at AMC's March 14, 2023 special meeting (or any adjournment thereof), pending a ruling by the Court on Plaintiffs' to-be-filed preliminary injunction motion."[56] The latter part of the order blocked the Conversion from taking effect until the Court could make a preliminary ruling on Plaintiffs' claims. The Court scheduled a preliminary injunction hearing for April 27.[57]

On March 2, in implementing the parties' stipulation, the Court consolidated the two actions and designated Franchi's complaint as the operative pleading.[58] On March 13, Plaintiffs' counsel informed the Court that they would also pursue the statutory claim set forth in Allegheny's complaint in the consolidated action.[59] Plaintiffs did not file a consolidated complaint.

AMC held the Special Meeting on March 14.[60] Both Proposals passed. Of the shares of common stock present at the meeting, 72.49% voted in favor of the

---

[56] D.I. 10 ¶¶ A–C; 2023-0216, D.I. 10 ¶¶ A–C.

[57] D.I. 10 ¶ 1; 2023-0216, D.I. 10 ¶ 1.

[58] D.I. 20; 2023-0216, D.I. 26.

[59] D.I. 34.

[60] Mar. 14, 2023 Form 8-K.

Share Increase Proposal[61] and 70.39% voted in favor of the Reverse Split Proposal.[62]

But only 35.23% of the 517,580,416 outstanding shares of common stock were present and voted at the Special Meeting, meaning only 25.54% of the outstanding common voted for the Share Increase Proposal, and 24.80% for the Reverse Split Proposal.[63]

Due to the mirrored voting feature, all the APE units were present and voted at the Special Meeting. Only 62.73% of APEs gave instructions on how to vote; that figure includes the 27.8% of the APEs that Antara agreed to vote in favor of the Proposals.[64] 91% of the APE units voted in favor of the Share Increase Proposal[65] and 90.64% in favor of the Reverse Split Proposal.[66] A majority of common

---

[61] *Id.* ("A total of 182,342,728 out of 517,580,416 eligible shares of the Company's Class A common stock ('Common Stock') were present in person or represented by proxy at the Special Meeting, and a total of 182,342,728 shares of Common Stock were voted after excluding broker non-votes."); *id.* (indicating 132,182,944 of the 182,342,728 common stockholders who were present at the Special Meeting voted for the Share Increase Proposal).

[62] *Id.*; *see also id.* (indicating 128,344,709 of the 182,342,728 common stockholders who were present at the Special Meeting voted for the Reverse Split Proposal).

[63] *Id.* (defining "Common Stock" to mean Class A common stock).

[64] *Id.*; Feb. 14, 2023 Proxy at 6.

[65] Mar. 14, 2023 Form 8-K ("A total of 583,297,321 out of 929,849,612 eligible AMC Preferred Equity Units ('APEs'), each constituting a depositary share representing 1/100th interest in a share of the Company's Series A Convertible Participating Preferred Stock (the 'Series A Preferred Stock'), were present in person or represented by proxy at the Special Meeting."); *id.* (indicating while 530,779,405 APEs voted for the Share Increase Proposal, the Depositary voted 846,129,420 in favor).

[66] *Id.*; *see also id.* (indicating while 528,679,900 APEs voted for the Reverse Split Proposal, the Depositary voted 842,782,544 in favor).

22

stockholders and a majority of the APE unitholders did not give any voting instructions at all, let alone in favor of the Proposals.[67]

The Proposals passed only because of the APEs' mirrored voting feature and Antara's promised APE votes. AMC acknowledged that fact internally.[68]

---

[67] The defendants continue to misrepresent the nature of the vote by including the uninstructed mirrored votes in the total. In this litigation, the defendants have touted, "AMC's Proposals to authorize additional shares of Common Stock and convert the APEs into Common Stock were overwhelmingly supported by holders of both APEs and Common Stock" and "[o]n March 14, 2023, holders of Common Stock and APEs voted resoundingly in favor of the Charter Proposals." DOB at 14–15 (capitalization altered); *see also, e.g.*, *id.* at 2 ("It is for this reason that AMC proposed—and the holders of Common Stock and APEs overwhelmingly approved in a March 14, 2023 stockholder vote . . . ."); *id.* at 30 ("[G]ranting Plaintiffs injunctive relief would have meant overriding the will of holders of Common Stock and APEs, who voted overwhelmingly in favor of the Charter Proposals."); D.I. 441, at Defendants' Reply Brief in Further Support of Proposed Settlement [hereinafter "DRB"], at 26 ("[T]he Charter Proposals . . . were overwhelmingly approved in the March 14, 2023 stockholder vote . . . ."); *id.* at 1 (same). But only 45.80% and 45.39% of outstanding common stockholders and APE unitholders together instructed a vote in favor of the Share Increase Proposal and Reverse Split Proposal, respectively. Mar. 14, 2023 Form 8-K. 132,182,944 common stockholders plus 530,779,405 APE unitholders instructed a vote in favor of the Share Increase Proposal, divided by 517,580,416 outstanding common shares plus 929,849,612 outstanding APE units, equals 45.80% of outstanding stockholders in favor of the Share Increase Proposal. *Id.* 128,344,709 common stockholders plus 528,679,900 APE unitholders in favor of the Reverse Split Proposal, divided by 517,580,416 outstanding common shares plus 929,849,612 outstanding APE units, equals 45.80% in favor of the Reverse Split Proposal. *Id.* This is hardly "overwhelming" or "resounding."

[68] POB at 27 (citing POB, Ex. 37 at AMC_00049559).

23

### E. The Parties Reach A Settlement And Seek To Effectuate The Proposals; Common Stockholders Speak Up.

Beginning two weeks after the Special Meeting, the parties participated in mediation and extensive follow-up negotiations.[69] The parties reached an agreement in principle to settle the case and executed a term sheet on April 2.[70]

The next day, Plaintiffs filed an unopposed motion to lift the status quo order.[71] Their application argued that the defendants should be permitted to implement the proposed settlement and complete the Conversion before notice had been provided to stockholders, before the proposed terms were considered by the Court, and before the proposed settlement was approved as fair.[72] Lifting the status quo order was a condition of their settlement.[73] On April 5, I found the parties failed to make their case for implementing the proposed settlement before it was approved, and therefore failed to establish good cause to vacate the stipulated status quo order.[74] The status quo order remains in place. On April 14, Plaintiffs' counsel

---

[69] *Id.* at 28.

[70] *Id.*

[71] D.I. 59.

[72] D.I. 69 at 2 (citing D.I. 59 ¶¶ 23, 26). The parties had not provided the Court a copy of the settlement term sheet. *Id.* at 2 n.6.

[73] *See* D.I. 59 ¶ 32 ("Unlike the more typical recovery of cash in exchange for release of claims, which this Court addresses in full at a final approval hearing, the settlement that Plaintiffs are prepared to support in exchange for a release of claims—the lifting of the status quo order and the effectuation of the issuance at the earliest possible date—requires performance before the final approval hearing can take place.").

[74] D.I. 69.

informed the Court the parties had agreed to revised terms that were not conditioned on lifting the status quo order, and requested a status conference with the Court "to discuss timing and notice for presentation of the proposed settlement."[75]

In the meantime, retail stockholders had contacted the Court via phone calls, letters, and filings to weigh in on the case and the terms of proposed settlement, which had yet to be disclosed.[76] Taking this engagement as a sign of unprecedented interest, the Court appointed Corinne Elise Amato, Esquire, as special master (the "Special Master") to "review[] any and all stockholder motions to intervene, as well as any oppositions and replies thereto, and mak[e] recommendations as to whether they should be granted," and to review "all timely and properly submitted stockholder objections and letters in support to the proposed settlement that post-date the stockholder notice of the proposed settlement in this action," and "provide the Court with a summary of the Submissions and the Special Master's

---

[75] D.I. 92 at 1.

[76] *E.g.*, D.I. 15; D.I. 29; D.I. 30; D.I. 31; D.I. 32; D.I. 38; D.I. 39; D.I. 47; D.I. 62; D.I. 63; D.I. 64; D.I. 65; D.I. 66; D.I. 67; D.I. 68; D.I. 70; D.I. 71; D.I. 72; D.I. 73; D.I. 74; D.I. 75; D.I. 76; D.I. 77; D.I. 78; D.I. 79; D.I. 80; D.I. 81; D.I. 82; D.I. 83; D.I. 84; D.I. 85; D.I. 86; D.I. 87; D.I. 88; D.I. 89; D.I. 94; D.I. 95; D.I 96; D.I. 97; D.I. 98; D.I. 99; D.I. 100; D.I. 103; D.I. 104; D.I. 105; D.I. 106; D.I. 107; D.I. 108; D.I. 109; D.I. 110; D.I. 111; D.I. 112; D.I. 113; D.I. 114; D.I. 115; D.I. 116; D.I. 117; D.I. 118; D.I. 119; D.I. 120; D.I. 121; D.I. 122; D.I. 123; D.I. 124; D.I. 125; D.I. 126; D.I. 127; D.I. 128; D.I. 129; D.I. 130; D.I. 131; D.I. 132; D.I. 133; D.I. 135; D.I. 136; D.I. 137; D.I. 138; D.I. 139; D.I. 140; D.I. 141; D.I. 142; D.I. 144; D.I. 145; D.I. 146; D.I. 147; D.I. 148. The foregoing were filed before the Court appointed the Special Master, and comprise only those letters accompanied by the requisite filing fee; the Court received many more letters.

recommendations as to how the Submissions should inform the Court's decision to approve or deny the proposed settlement."[77] The next day, the Special Master accepted her appointment.[78] On May 2, the Court expanded the Special Master's purview "to include other submissions from interested parties styled as motions."[79] The Special Master wrote nineteen reports and recommendations.[80]

On April 27, after prompting from the Court,[81] the parties filed a stipulation of settlement (the "Stipulation").[82] Under its terms, AMC agreed to distribute 6,922,565 shares of common stock to existing common stockholders, at a ratio of one share of common for every seven and a half shares of common stock held, after the Reverse Split but before the Conversion.[83] Any fractional shares would be sold

---

[77] D.I. 149 ¶¶ 1–2.

[78] D.I. 158.

[79] D.I. 187 at 1.

[80] D.I. 182; D.I. 224; D.I. 292; D.I. 293; D.I. 301; D.I. 302; D.I. 307; D.I. 324; D.I. 326; D.I. 331; D.I. 341; D.I. 350; D.I. 365; D.I. 434; D.I. 451; D.I. 475; D.I. 482; D.I. 518; D.I. 536.

[81] D.I. 163.

[82] Stip.

[83] POB at 31; Stip. ¶ A.1(aa) ("'Settlement Payment' means one share of Common Stock for every 7.5 shares of Common Stock owned by record holders of Common Stock as of the Settlement Class Time (after giving effect to the Reverse Stock Split)."); Notice ¶ 44 ("If the proposed Settlement is approved, AMC will promptly effect the Conversion and issue to the record holders of Common Stock as of the Settlement Class Time one share of Common Stock for every 7.5 shares of Common Stock owned by such holders (after giving effect to the Reverse Stock Split and taking into account cash payments in lieu of fractional shares)."); id. ¶ 30 ("Only record holders of Common Stock as of the 'Settlement Class Time' will be entitled to a Settlement Payment."); id. ¶ 47 ("As noted above, the Settlement

26

and the cash proceeds distributed pro rata.[84]

The Proposed Settlement has the practical effect of reallocating the ownership of AMC's equity between its common stockholders and the APE unitholders. If the settlement is approved, the existing common stockholders would own a slightly bigger slice of the AMC pie at the expense of the APE unitholders. The Proposed Settlement thus ameliorates some of the dilution that the APEs inflicted on the common stock. Without the Proposed Settlement, the existing common stockholders would own 34.28% of AMC's equity after the Conversion and the former APEs unitholders would own 65.72%.[85] With the Proposed Settlement, the existing common stockholders would own 37.15% of AMC's equity after the Conversion and the former APEs unitholders would own 62.85%.[86] In exchange for this increased slice of ownership, the common stockholders would release all claims

---

Payment will be issued to record holders of Common Stock as of the Settlement Class Time; that is, the time after the Reverse Stock Split has effected but immediately before the APEs are converted into Common Stock.").

[84] Notice ¶ 45 ("No fractional shares of Common Stock will be issued as part of the Settlement Payment. Settlement Class Members who would otherwise be entitled to receive a fractional share of the Settlement Payment will receive a cash payment in lieu thereof in the same manner as will be provided in connection with the Reverse Stock Split . . . . In other words, Settlement Class Members entitled to payment will receive one share of Common Stock for every 7.5 shares of Common Stock they owned as of the Settlement Class Time and will receive cash for the remaining shares of Common Stock they own that add up to less than 7.5 shares.").

[85] POB at 31.

[86] *Id.*

27

asserted in or relating to the allegations in the Allegheny complaint or the operative complaint "that relate to the ownership of Common Stock and/or [APEs] during the Class Period."[87]

The Stipulation attached a Proposed Scheduling Order with Respect to Notice and Settlement Hearing (the "Scheduling Order"), and a Notice of Pendency of Stockholder Class Action and Proposed Settlement, Settlement Hearing, and Right to Appear (the "Notice").[88] After filing revised versions of the Scheduling Order and the Notice, the Court entered the scheduling order attaching the final version of the Notice on May 1.[89] The Stipulation and Notice define a proposed "Settlement Class" to mean "all holders of AMC Common Stock between August 3, 2022, through and including the Settlement Class Time," or record time, "after the Reverse Stock Split is effected, but before the Conversion."[90] The Scheduling Order and

[87] Stip. ¶ A.1(r); *accord* Notice ¶ 51(a) (defining "Released Plaintiffs' Claims"); *see also* Stip. ¶ A.1(d) ("'Class Period' means the period from August 3, 2022 through and including the Settlement Class Time.").

[88] Stip.

[89] Sched. Ord.; Notice; *see also* D.I. 175; D.I. 181; D.I. 183; D.I. 184.

[90] Notice ¶ 29 ("The 'Settlement Class' means all holders of AMC Common Stock between August 3, 2022, through and including the Settlement Class Time, whether beneficial or of record, including the legal representatives, heirs, successors-in-interest, transferees, and assignees of all such foregoing holders, but excluding Defendants. 'Settlement Class Time' means the record time, expected to be set as of the close of business in accordance with any New York Stock Exchange and/or Depository Trust Company requirements or policies, on the business day prior to Conversion on which the Reverse Stock Split is effective. Put slightly differently, if you owned AMC Common Stock between August 3, 2022, through and including the time after the Reverse Stock Split is effected, but before

Notice set the objection deadline for May 31 and the settlement hearing for June 29 and 30 (the "Settlement Hearing").[91] On May 3, the Court filed a letter to stockholders explaining procedures for objecting and speaking at the Settlement Hearing (the "May 3 Letter").[92]

Approximately 2,850 purported stockholders submitted more than 3,500 communications, many of which were styled as objections, that were emailed or postmarked between May 1 and May 31, 2023.[93] Two objecting stockholders

---

the Conversion, you are a member of the Settlement Class."); *id.* ¶ 64(v) (requiring stockholders to "include documentation sufficient to prove that the Objector or Supporter is a member of the Settlement Class (*i.e.*, held shares of AMC Common Stock between August 3, 2022, though and including the date the objection or statement of support is made)."); Stip. ¶ A.1(d) ("'<u>Class Period</u>' means the period from August 3, 2022 through and including the Settlement Class Time."); *id.* ¶ 1(w) ("'<u>Settlement Class</u>' means a non-opt-out class for settlement purposes only, and pursuant to Court of Chancery Rules 23(a), 23(b)(1), and 23(b)(2), consisting of all holders of Common Stock during the Class Period . . . ."); D.I. 537 at 4 ("The Settlement Class includes all stockholder who held at any time between August 3, 2022 through and including the Class Settlement Time."); *cf.* Op. Compl. ¶ 153 ("Plaintiffs, who are stockholders of the Company, bring this action as a class action pursuant to Rule 23 of the Rules of the Court of Chancery of the State of Delaware on behalf of all similarly situated holders of shares of AMC Common Stock (the 'Class')."); Non-Op. Compl. ¶ 84 ("Plaintiff brings this Action pursuant to Chancery Court Rule 23, on behalf of all other holders of Class A common stock (except Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with them and their successors-in-interest) who are or will be threatened with injury arising from Defendants' wrongful actions, as more fully described herein (the 'Class').").

[91] Sched. Ord. ¶¶ 6, 18; Notice at 3; *id.* ¶¶ 60, 63.

[92] D.I. 190, Ex. 1 [hereinafter "May 3 Ltr."].

[93] PRB at 8; D.I. 518 [hereinafter "Rpt."], at 22.

retained counsel: Rose Izzo and Anthony Kramer, who joined in Izzo's objection.[94]

The parties filed briefs in support of the Proposed Settlement and responded to the

objections.[95] On June 21, the Special Master filed her report and recommendations

(the "Special Master's Report").[96] Plaintiffs and thirteen putative stockholders

timely filed exceptions to the Special Master's Report by the June 28 deadline.[97] I

held the Settlement Hearing on June 29 and 30.[98]

---

[94] D.I. 310; D.I. 315; Izzo Obj.; D.I. 505; D.I. 506. Kramer states in his joinder that he was unaware of the Proposed Settlement until June 2, 2023, citing to an email he sent to Plaintiffs' counsel on June 2, 2023. D.I. 506 at 1, D.I. 506, Ex. B. The email he submitted as Exhibit B, however, does not support the statement in his joinder. Kramer's Exhibit B only says he had not received a post card by June 2, 2023. D.I. 506, Ex. B. Kramer did not verify under oath that he was unaware of the Proposed Settlement until June 2, 2023. In any event, Kramer did not provide any new substantive arguments against approval of the Proposed Settlement.

[95] DOB; POB; DRB; PRB.

[96] Rpt.

[97] D.I. 533; D.I. 541; D.I. 543; D.I. 547; D.I. 552; D.I. 553; D.I. 554; D.I. 556; D.I. 558; D.I. 559; D.I. 560; D.I. 564; D.I. 565; D.I. 566; D.I. 573; Sched. Ord. ¶ 23 ("The Parties may file any exceptions to the Special Master's Report and Recommendation no later than June 28, 2023."); May 3 Ltr. at 3 ("Exceptions must be received and docketed by June 28, 2023 for the Court to consider them." (emphasis omitted)).

[98] D.I. 572; Hr'g Tr.

On July 19, a putative stockholder submitted a document entitled "Interlocutory appeal" that the Delaware Supreme Court "deemed a notice of appeal from an unknow[n] Order" in this action. *In RE: AMC Ent. Hldgs. Inc. S'holder Litig.*, C.A. No. 258,2023, D.I. 1 (Del. July 19, 2023). On July 20, the Supreme Court filed a Notice to Show Cause to the pro se appellant directing him "to show cause why this appeal should not be dismissed under Supreme Court Rule 29(b) for [his] failure to identify a court order subject to appellate review." *In RE: AMC Ent. Hldgs. Inc. S'holder Litig.*, C.A. No. 258,2023, D.I. 4 (Del. July 20, 2023). The Supreme Court directed the putative stockholder to respond in writing within ten days after receipt of the notice. *Id.* The filing of what, if perfected, would be an interlocutory appeal does not divest this Court of jurisdiction. *Radulski ex rel. Taylor*

During the leadup to the Proposed Settlement, the conflicting interests between the common stockholders and APE unitholders were on display. First, objector Izzo, who owns more APEs than common shares, intimated she seeks to become lead plaintiff. In opposing this move, Plaintiffs acknowledged the adversity between the common stockholders and the APE unitholders by asserting that Izzo is not "qualified to speak for the Class" because she owns more APE than common, "and thus would benefit financially if the Settlement were rejected and the Conversion happened someday on worse terms to the Class," giving rise to "a facial conflict of interest."[99] Second, a putative intervenor who held APE units, but not any common stock, sought to intervene to protect the value of his APEs from the Proposed Settlement.[100]

## II.       ANALYSIS

"Although Delaware law has traditionally favored a voluntary settlement of contested claims, the settlement of claims raised in a class action require certain

---

*v. Del. State Hosp. ex re. Div. of Alcoholism, Drug Abuse & Mental Health, of Dep't of Health & Soc. Servs.*, 541 A.2d 562, 567 (Del. 1988) ("With the exception of interlocutory appeals, the proper perfection of an appeal to this Court generally divests the trial court of its jurisdiction over the cause of action." (collecting authorities)); *Matter of Heizer Corp.*, 1989 WL 112547, at *7 (Del. Ch. Mar. 28, 1989) (concluding the trial court retains jurisdiction "either because of the interlocutory nature of the attempted appeal or the fact that the appeal was not properly perfected" (citing *Radulski*, 541 A.2d at 567)).

[99] PRB at 5–6 n.7, 43 n.113.

[100] D.I. 346 (seeking intervention); D.I. 536 (denying intervention).

31

safeguards to 'insure that the interests of parties who are before the Court only vicariously are not inequitably abrogated.'"[101]  Under Court of Chancery Rule 23(e), "class action[s] shall not be dismissed or compromised without the approval of the Court, and notice . . . to all members of the class."[102]  The Court must consider whether the terms of the settlement are fair and reasonable, recognizing that "[t]his Court generally favors settlement of complicated litigation."[103]

"When parties have reached a negotiated settlement, the litigation enters a new and unusual phase where former adversaries join forces to convince the court that their settlement is fair and appropriate."[104]  "The settlement's proponents bear

---

[101] *Rinaldi v. Iomega Corp.*, 2001 WL 34890424, at *5 (Del. Super. June 29, 2001) (citations omitted) (citing *Nottingham P'rs v. Dana*, 564 A.2d 1089, 1102 (Del. 1989), and *Polk v. Good*, 507 A.2d 531, 535 (Del. 1986), and then quoting Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9-4[a] (2000))); *id.* ("If settlements of pending litigation are the cherished offspring of the law, settlements of representative actions are no doubt the least ingratiating of the brood." (quoting Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9-4[a] (2000))); 2 Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* [hereinafter "Wolfe & Pittenger"] § 13.03[a] at 13-11 (2d ed. 2022) (same).

[102] Ct. Ch. R. 23(e).

[103] *Gatz v. Ponsoldt*, 2009 WL 1743760, at *2 (Del. Ch. June 12, 2009); *accord id.* ("However, the settlement of a class action is unique because the fiduciary nature of the class action requires the Court of Chancery to participate in the consummation of the settlement to the extent of determining its intrinsic fairness." (alterations and internal quotation marks omitted) (quoting *Rome v. Archer*, 197 A.2d 49, 53 (Del. 1964), and citing *Nottingham*, 564 A.2d at 1102)).

[104] *Ginsburg v. Phila. Stock Exch., Inc.*, 2007 WL 2982238, at *1 (Del. Ch. Oct. 9, 2007); *accord In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 893 (Del. Ch. 2016) ("Once an

32

the burden of persuasion by a preponderance of the evidence."[105]  "[I]n most instances, the court is constrained by the absence of a truly adversarial process, since inevitably both sides support the settlement and legally assisted objectors are rare."[106]

Typically, the Court considers whether to approve a settlement in steps.[107] First, it determines whether it can certify the putative class under Rules 23(a) and 23(b).  If the Court certifies a class, it next examines whether the notice of the settlement that the parties provided to the class was sufficient to satisfy the requirements of due process.  If it finds that notice was adequate, it moves on to considering whether the settlement terms fall within a range of reasonableness.  If

---

agreement-in-principle is struck to settle for supplemental disclosures, the litigation takes on an entirely different, non-adversarial character.  Both sides of the caption then share the same interest in obtaining the Court's approval of the settlement." (footnotes omitted)).

[105] *In re TD Banknorth*, 938 A.2d 654, 658 n.4 (Del. Ch. 2007) (citing *In re First Boston, Inc. S'holders Litig.*, 1990 WL 78836, at *9 (Del. Ch. Jun. 7, 1990)).

[106] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 961 (Del. Ch. 1996).

[107] *See, e.g.*, *Activision*, 124 A.3d at 1043 ("The tasks assigned to the court include (i) confirming that the Settlement is properly structured, (ii) ensuring that adequate notice has been provided, (iii) assessing the reasonableness of the 'give' and the 'get,' as well as the allocation of the 'get' among various claimants, (iv) approving an appropriate award of attorneys' fees, and (v) authorizing any payment from the fee award to the representative plaintiff."); *CME Grp., Inc. v. Chi. Bd. Options Exch., Inc.*, 2009 WL 1547510, at *4 (Del. Ch. June 3, 2009) ("The Court starts with consideration of whether class certification is appropriate and whether the Settlement in gross should be approved.  It then turns its attention to the various specific objections to the terms of the Settlement."); *cf. In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019, at *6 (Del. Ch. Mar. 31, 2009) ("Because their contentions define the principal, discrete issues for resolution, the Court turns to them first, before taking the more familiar path through the thickets of class certification and consideration of whether to approve the Proposed Settlement.").

they do, then the Court will approve the settlement. Only then will the Court determine whether to award fees and expenses to the plaintiff's counsel and incentive awards to the representative plaintiff.

Here, in an effort to accommodate the parties' repeated requests for expedited resolution,[108] my analysis begins and ends with the Proposed Settlement's reasonableness. I conclude the Proposed Settlement cannot be approved because the release encompasses APE claims that Plaintiffs, who only sued on behalf of a putative class of common stockholders and only brought common claims, cannot release. The claims arising out of APE units are based on a different factual predicate, adhered to a different security, and not supported by consideration.

## A. The Release Is Unsound.

A key consideration in the approval of a derivative or class action settlement is to ensure that the interests of the represented parties have not fallen victim—intentionally or inadvertently—to the personal interests of the representative plaintiff and its counsel. The Court's involvement arises from the need to ensure absent stockholders are adequately represented, and to guard against buyouts of

---

[108] *See, e.g.*, D.I. 25 (requesting an expedited schedule); D.I. 10 ¶ A (granting an expedited schedule); 2023-0216, D.I. 10 ¶ A (same); D.I. 217 (asking the Court for an expedited settlement timeline due to financial constraints); Sched. Ord. (granting an expedited settlement timeline).

34

plaintiffs at the expense of those whom they purport to represent.[109] The Court must act as a fiduciary on behalf of the class to ensure that the outcome falls within a range of reasonable outcomes that a disinterested decision-maker, acting on behalf of the class and with the benefit of the information available, could accept.[110]

Because of the limited inquiry involved, "[t]he Court's role in reviewing the proposed Settlement . . . is quite restricted."[111] The Court does not approve settlements on the theory that any settlement is a virtue. The Court "must balance the policy preference for settlement against the need to insure that the interests of the shareholders . . . had been fairly represented."[112]

"Settlement agreements 'almost invariably' include general release provisions that bind the class and release all liability claims associated with the challenged

---

[109] *E.g.*, *In re Celera Corp. S'holder Litig.*, 59 A.3d 418, 434 (Del. 2012) ("Rule 23(e)'s requirement that court approval be obtained before any settlement is consummated and the Court of Chancery's role in reviewing the settlement is required to safeguard due process rights, to ensure that the settlement represents 'a genuine bargained-for exchange between adversaries with a bona fide stake in the litigation,' and also that the settlement agreement's terms 'provide a benefit to the members of the class and not merely a promise to pay the fees of their counsel.'" (footnotes omitted) (citing then quoting *Prezant v. De Angelis*, 636 A.2d 915, 923 (Del. 1994))); *id.* ("Court of Chancery Rule 23 is designed to protect the due process rights of absent class members. Only through strict compliance with Rule 23 may a court's judgment bind the absent members." (quoting *Countrywide*, 2009 WL 846019, at *10)).

[110] *Activision*, 124 A.3d at 1064 (quoting *Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2013 WL 458373, at *2 (Del. Ch. Feb. 6, 2013)).

[111] *Sullivan v. Hammer*, 1990 WL 114223, at *4 (Del. Ch. Aug. 7, 1990), *aff'd sub nom. Kahn v. Sullivan*, 594 A.2d 48 (Del. 1991).

[112] *Kahn*, 594 A.2d at 63 (citing *Barkan v. Amsted Indus. Inc.*, 567 A.2d 1279, 1283 (Del. 1989)).

transaction 'to the broadest extent allowable under law.'  Such broad release provisions are intended to accord the defendants 'global peace.'"[113]  The Delaware Supreme Court has made plain that the Court's duty to protect absent stockholders carries particular significance when reviewing a release.[114]  While the Court need not second-guess or optimize every element of a settlement, the breadth of the release requires careful inspection.  In the words of the Delaware Supreme Court, "the Court of Chancery must scrutinize releases to 'ensure [(i)] that the fiduciary nature of the class action is respected, and [(ii)] that its approval of any class-based settlement does not offend due process.'"[115]  The scope of a release "cannot be limitless, if only because of substantive due process concerns."[116]

Here, the Stipulation includes the following release from those Settlement Class Members (the "Release"):

---

[113] *Celera*, 59 A.3d at 433 (footnotes omitted) (quoting *Countrywide*, 2009 WL 846019, at *10).

[114] *See Griffith v. Stein ex rel. Goldman Sachs Grp., Inc.*, 283 A.3d 1124, 1133–37 (Del. 2022) (citations omitted).

[115] *Id.* at 1134 (quoting *Celera*, 59 A.3d at 434).

[116] *In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1145 (Del. 2008) (citing *Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 388 (1996) (Ginsburg, J., concurring), *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 (1985), and *In re Advanced Mammography Sys., Inc. S'holders Litig.*, 1996 WL 633409, at *1 (Del. Ch. Oct. 30, 1996)).

"Released Plaintiffs' Claims" means any and all actions, causes of action, suits, liabilities, claims, rights of action, debts, sums of money, covenants, contracts, controversies, agreements, promises, damages, contributions, indemnities, and demands of every nature and description, whether or not currently asserted, whether known claims or Unknown Claims, suspected, existing, or discoverable, whether arising under federal, state, common, or foreign law, and whether based on contract, tort, statute, law, equity, or otherwise (including, but not limited to, federal and state securities laws), that Plaintiffs or any other Settlement Class Member: (i) asserted in the *Allegheny* Complaint or the *Munoz* [Franchi] Complaint; or (ii) ever had, now have, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity that, in full or part, concern, relate to, arise out of, or are in any way connected to or based upon the allegations, transactions, facts, matters, occurrences, representations, or omissions involved, set forth, or referred to in the Complaints *and that relate to the ownership of Common Stock and/or AMC Preferred Equity Units during the Class Period*, except claims with regard to enforcement of the Settlement and this Stipulation.[117]

The Stipulation defines "Settlement Class Member" as "a Person who is a member of the Settlement Class."[118] It defines "Settlement Class" as "a non-opt-out class for settlement purposes only, and pursuant to Court of Chancery Rules 23(a), 23(b)(1), and 23(b)(2), consisting of all holders of Common Stock during the Class Period."[119]

The "'Class Period' means the period from August 3, 2022 through and including the Settlement Class Time," which is "the record time, expected to be set as of the close of business on the business day prior to Conversion on which the Reverse

---

[117] Stip. ¶ A.1(r) (emphasis added); *accord* Notice ¶ 51(a) (defining "Released Plaintiffs' Claims").

[118] *Id.* ¶ A.1(x).

[119] *Id.* ¶ A.1(w).

Stock Split is effective."[120]  Plaintiffs have clarified that the definition of Settlement Class "includes all stockholders who held [or purchased] at any time between August 3, 2022 through and including the Settlement Class Time," as long as they continued to hold at the Settlement Class Time.[121]

The Release purports to cause common stockholders who held common stock at any time after the APE issuance to release not only claims that "relate to the ownership of Common Stock," but also claims that relate to the ownership of "AMC Preferred Equity Units," or APEs.  Under controlling precedent, Plaintiffs cannot release APE claims.

> ### 1. Plaintiffs Cannot Release APE Claims Because They Do Not Arise From The Identical Factual Predicate As The Claims Asserted On Behalf Of The Class Of Common Stockholders.

"When a stockholder of a Delaware corporation files suit as a representative plaintiff for a class of similarly situated stockholders, the plaintiff voluntarily assumes the role of fiduciary for the class."[122]  "[W]hile the stockholders have

---

[120] *Id.* ¶¶ A.1(d), (y).

[121] D.I. 537 at 4.

[122] *Steinhardt v. Howard-Anderson*, 2012 WL 29340, at *8 (Del. Ch. Jan. 6, 2012) (citing *Emerald P'rs v. Berlin*, 564 A.2d 670, 673 (Del. Ch. 1989), and *Youngman v. Tahmoush*, 457 A.2d 376, 379 (Del. Ch. 1983)); *accord Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2022 WL 728844, at *5 (Del. Ch. Mar. 11, 2022) ("When filing as a representative plaintiff for a class of stockholders, that party seeks out the role of fiduciary for the class." (citing *Steinhardt*, 2012 WL 29340, at *8, and then *OptimisCorp v. Atkins*, 2021 WL 2961482, at *5–7 (Del. Ch. July 15, 2021))).

chosen the corporate director or manager, they have no such election as to a plaintiff who steps forward to represent them. He is a self-chosen representative and a volunteer champion."[123] The bedrock principles underlying class actions "limit the powers of the representative parties to the claims they possess in common with other members of the class."[124] In a class action, the representative plaintiffs can only bring claims on behalf of similarly situated class members and can only release claims that the class members could have asserted on the facts pled.[125]

[123] *Straight Path*, 2022 WL 728844, at *5 (Del. Ch. Mar. 11, 2022) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949)).

[124] *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 16 (2d Cir. 1981); *accord id.* at 18 ("Under the circumstances here being considered, the named plaintiffs were authorized to represent other members of the class solely with respect to liquidated contracts. They were never authorized to represent such members with respect to unliquidated contracts. Having received authority to represent class members solely with respect to liquidated contracts, plaintiffs had no power to release any claims based on any other contracts.").

[125] *Steinhardt*, 2012 WL 29340, at *8 (citing *Emerald P'rs*, 564 A.2d at 673, and *Youngman*, 457 A.2d at 379); *Nottingham*, 564 A.2d at 1106 (quoting *TBK P'rs, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)); *cf.* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1751 (4th ed.) (describing the history and purpose of a class action as "enabl[ing] an equity court to hear an action by or against representatives of a group if plaintiff could establish that the number of people involved was so large as to make joinder impossible or impracticable, that all the members of the group possessed a joint interest in the question to be adjudicated, and that the named parties adequately represented those absent from the action"); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) ("The class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.' For in such cases, 'the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class

"In Delaware, the limiting principle is that a settlement can release claims that were not specifically asserted in the settled action, but only if those claims are based on the same identical factual predicate or the same set of operative facts as the underlying action."[126] The identical factual predicate test imposes meaningful limits on the scope of a release. All released claims must be based on the identical factual predicate that gave rise to the claims that were actually asserted in the settled action.[127] "[A] release may be overbroad if it could be interpreted to 'encompass any claim that has some relationship—however remote or tangential—to any "fact," "act," or conduct "referred to" in the Action.' In other words, a release is overly broad if it releases claims based on a common set of tangential facts, as opposed to operative or core facts."[128]

---

member] to be litigated in an economical fashion under Rule 23.'" (citations omitted) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979))); *id.* at 156 ("We have repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (internal quotation marks omitted) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977))).

[126] *Phila. Stock Exch.*, 945 A.2d at 1146 (internal quotation marks omitted) (quoting *UniSuper, Ltd. v. News Corp.*, 898 A.2d 344, 347 (Del. Ch. 2006)).

[127] *Nottingham*, 564 A.2d at 1106 ("We therefore conclude that in order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, *a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action* even though the claim was not presented and might not have been presentable in the class action." (emphasis added) (quoting *TBK P'rs*, 675 F.2d at 460)).

[128] *Phila. Stock Exch.*, 945 A.2d at 1146 (quoting *UniSuper*, 898 A.2d at 347).

If an identical factual predicate exists, and if the settlement is otherwise fair and comports with due process, then the release can encompass claims "not specifically asserted" in the settled class action.[129] The release can even extend to claims arising from that identical factual predicate that "might not have even been presentable in the class action."[130] Here, that means (i) federal claims over which a state court lacks subject matter jurisdiction[131] and (ii) class members' personal claims for which the representative plaintiffs lack standing.[132]

Federal precedent relied on by the Delaware Supreme Court makes clear that when a released claim is based on a property interest that is different than the interest that underlies the claims asserted in the action, then the release fails for lack of an identical factual predicate. In *National Super Spuds, Inc. v. New York Mercantile*

---

[129] *Id.* (quoting *UniSuper*, 898 A.2d at 347).

[130] *Id.* (quoting *Nottingham*, 564 A.2d at 1106)).

[131] *E.g.*, *In re MCA, Inc.*, 598 A.2d 687, 691 (Del. Ch. 1991) ("It is not disputed that this Court may enter a judgment in connection with the settlement of a class action that results in the release of both state law claims and exclusively federal claims if the claims arise from the same factual predicate, even if the state court could not dismiss or adjudicate the federal claims." (citations omitted)); *Ryan v. Gifford*, 2009 WL 18143, at *8 (Del. Ch. Jan. 2, 2009) (citing *Matsushita*, 516 U.S. at 380–86, and *In re Union Square Assocs. Sec. Litig.*, 1993 WL 513232, at *5 (Del. Ch. Nov. 29, 1993), and *MCA*, 598 A.2d at 691); *Nottingham*, 564 A.2d at 1106).

[132] *E.g.*, *Activision*, 124 A.3d at 1044.

Courts have also upheld class action settlement releases barring subsequent litigation of: (i) state claims based on the identical factual predicates as claims asserted in a federal settlement (*TBK P'rs*, 675 F.2d 456); and (ii) arbitration claims based on the identical factual predicate of the claims settled in court (*Union Square*, 1993 WL 513232, at *6).

41

*Exchange*, the underlying facts involved defaults under May 1976 Maine potato futures contracts.[133] The representative plaintiffs asserted claims on behalf of parties who suffered damages from liquidating their contracts at a loss.[134] Dexter Richards held not only contracts that he liquidated at a loss, but also contracts that he had not liquidated.[135] In an attempt to protect both interests, Richards first sought to opt out of the liquidated contracts class settlement and bring his own individual action seeking damages for his unliquidated contracts.[136] Later, he repudiated his opt-out, dismissed his individual action, and rejoined the liquidated contracts class action.[137] Then, he filed a second class action seeking damages for unliquidated contract claims.[138]

The liquidated contracts class action settled.[139] In addition to the liquidated contracts claims, the release purported to include claims for damage to unliquidated contracts.[140] The trial court approved the settlement, and Richards appealed.

---

[133] 660 F.2d 9.

[134] *Id.* at 12.

[135] *Id.*

[136] *Id.*

[137] *Id.*

[138] *Id.* at 13.

[139] *Id.*

[140] *Id.* at 13–14.

The United States Court of Appeals for the Second Circuit reversed the order approving the settlement. It began from the premise that the representative plaintiffs' complaint was brought only "on behalf of all persons who liquidated long positions" in the relevant potato future contracts.[141] "The gravamen of the complaint was the claim that defendants' wrongful conduct had depressed the price of the contracts and had thereby caused injury to persons who liquidated long positions."[142] "At no point did plaintiffs seek authority to represent members of the class with respect to claims based on unliquidated contracts."[143] "Plaintiffs were thus empowered to represent members of the class solely with respect to the contracts in which all members of the class had a common interest:" liquidated contracts.[144]

Because liquidated contract claims defined the class, plaintiffs with a liquidated contract claim were authorized to represent only those claims and others based on the identical factual predicate. The Second Circuit observed that unliquidated contract claims depended "upon proof of further facts, namely, the holding of unliquidated contracts after May 7, wrongful default on those contracts,

---

[141] *Id.* at 16; *see also id.* at 17 n.6 (discussing Federal Rule of Civil Procedure 23's typicality requirement and stating: "This justification for permitting the representatives to sue on behalf of the class has no application to claims of class members in which the representatives have no interest and which, as shown here, they are willing to throw to the winds in order to settle their own claims.").

[142] *Id.* at 16–17.

[143] *Id.* at 17.

[144] *Id.*

43

and the damages caused by default."[145]  In other words, unliquidated contract claims were not based on the identical factual predicate as the asserted liquidated contract claims.  The representative plaintiffs could not represent an unliquidated contract claim.[146]

From there, the Second Circuit reasoned that the release could not encompass unliquidated contract claims.  "Having received authority to represent class members solely with respect to liquidated contracts, plaintiffs had no power to release any claims based on any other contracts."[147]  It provided pragmatic context:

> If the case had proceeded to trial and a judgment had been entered in favor of the defendants, that judgment would have barred all members of the class who had not opted out from bringing any claim based on contracts they liquidated.  Such a judgment would not have barred members of the class from bringing any other claim they might be able to assert against the defendants, including claims based on contracts unliquidated at the close of trading on [the operative date].  If a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either.[148]

---

[145] *Id.* at 18 n.7.

[146] *Id.* at 16–18; *see also id.* at 18 ("[I]n representative suits (i.e., class actions, as opposed to derivative suits) there is no one with power to give a release of the class rights in addition to the judgment.  The protection afforded the defendants by the judgment rests on its res judicata effect and is, therefore, limited to the claims alleged in the pleadings." (internal quotation marks and citations omitted) (quoting William E. Haudek, *The Settlement and Dismissal of Stockholders' Action Part II:  The Settlement*, 23 Sw.L.J. 765, 773 (1969))).

[147] *Id.* at 18 (footnote omitted).

[148] *Id.* at 17–18.

The Delaware Supreme Court looked to *National Super Spuds* in *Nottingham Partners v. Dana*.[149]

This Court has similarly concluded that a class action release did not encompass claims based on a property interest different from the property interest giving rise to the claims in the complaint. In *In re Union Square Associates Securities Litigation*, the plaintiff was a member of a class of holders of limited partnership interests in the "Union Square Partnership."[150] That action settled, the plaintiff received notice, and the plaintiff did not opt out. This Court approved the settlement, including a release of claims arising out of purchases of Union Square Partnership interests.[151] Two years later, the plaintiff brought an action alleging violations of the Indiana Securities Act based on the defendants' investment of her money in not only the Union Square Partnership, but also other partnerships.[152] The Indiana defendants asked this Court to determine whether the plaintiff's claims were

---

[149] 564 A.2d at 1106 ("The decision of the Second Circuit Court of Appeals in *National Super Spuds, Inc.* held that a general release given by a class plaintiff who represented only those persons who had liquidated their positions in potato future contracts between April 13 and May 7, 1976, could not extend to the claims of persons outside of the class holding unliquidated contracts after May 7, 1976."). I read *National Super Spuds* to explain that while Richards was a member of the liquidated contract claim class, his unliquidated contract claim was still beyond the reach of the class plaintiff's release. 660 F.2d at 18.

[150] 1993 WL 513232, at *1.

[151] *Id.* at *1–2, *9.

[152] *Id.* at *2.

barred by res judicata.[153]  This Court determined "[b]ecause plaintiff's individual complaint and the Class Action are based on the same factual predicate, plaintiff is barred from raising her claims by the doctrine of res judicata, if she was given sufficient notice to object to the fairness of the Union Square Partnership Settlement."[154]  But then-Vice Chancellor Chandler specified that the "[p]laintiff's claims regarding other limited partnership investments, however, are not affected by this Order."[155]  These claims were not barred by the release because they were not based on the identical factual predicate underlying the class action.

Here, Plaintiffs are AMC common stockholders who purport to represent a class of common stockholders in pursuit of direct claims belonging to the common stockholders based on rights appurtenant to their shares of common stock.[156]  The

---

[153] *Id.*

[154] *Id.* at *6.

[155] *Id.* at *9.

[156] Op. Compl. ¶ 153 ("Plaintiffs, who are stockholders of the Company, bring this action as a class action pursuant to Rule 23 of the Rules of the Court of Chancery of the State of Delaware on behalf of all similarly situated holders of shares of AMC Common Stock (the 'Class')."); *id.* ¶ 39 ("Anthony Franchi is a holder of AMC Common Stock and has held such stock at all relevant times."); *id.* at caption ("USBALDO MUNOZ and ANTHONY FRANCHI, individually and on behalf of all others similarly situated"); Non-Op. Compl. ¶ 16 ("Plaintiff Allegheny County Employees' Retirement System is a stockholder of AMC and has owned AMC common stock at all material times alleged in the Complaint."); *id.* ¶ 84 ("Plaintiff brings this Action pursuant to Chancery Court Rule 23, on behalf of all other holders of Class A common stock (except Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with them and their successors-in-interest) who are or will be threatened with injury arising from Defendants' wrongful actions, as more fully described herein (the 'Class')."); *id.* ¶ 16 ("Plaintiff Allegheny County

---

parties stipulated to—and the Court granted—them status as lead plaintiffs for a putative class of common stockholders.  In that capacity, they sought to enforce the rights belonging to and to remedy the alleged harm suffered by the common stockholders.[157]  Plaintiffs did not bring an action on behalf of a class of APE unitholders.  They did not plead their status as APE unitholders, assert claims enforcing the rights of APE unitholders, or allege damage suffered as a result of holding APE units.[158]  Plaintiffs have undertaken a fiduciary role only as to the claims asserted enforcing the common stock's rights on behalf of, and remedying the alleged harm suffered by, the class of common stockholders.

*National Super Spuds* found the bare facts necessary to plead the possession of, and harm to, a separate interest were enough to divorce claims arising out of that interest from the underlying complaint's factual predicate.  Richards, a holder of liquidated contracts and therefore a member of the class, would have had to plead his holding of unliquidated contracts and harm to those interests in order to state a

Employees' Retirement System is a stockholder of AMC and has owned AMC common stock at all material times alleged in the Complaint."); *id.* at caption ("ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all other similarly-situated Class A stockholders of AMC ENTERTAINMENT HOLDINGS, INC.").

[157] D.I. 14 ¶ 5; D.I. 20 ¶ 5; 2023-0216, D.I. 24 ¶ 5; 2023-0216, D.I. 26 ¶ 5.

[158] Hr'g Tr. 82 ("[W]e're not representing a class of APE holders."); *id.* at 83 ("But, again, we're not representing APEs.").

claim, which would therefore not be based on the identical factual predicate of the liquidated class claim.

So too here. At a minimum, APE claims require the additional facts of holding APE units and harm to APE unitholder rights.[159] A common stockholder would have to plead her holding of APE units and harm to that interest. Resolution of Plaintiffs' common claims at trial would not resolve APE claims.

And the facts diverge further from there. The antagonism between common and APE interests means the events set forth in Plaintiffs' complaints affected those interests in divergent ways. The factual predicate for this action asserts "weaponized" APEs harmed the rights of common stockholders.[160] It asserts the creation, issuance, and voting power of APE units infringed the common law and statutory voting rights of common stockholders.[161] Fundamentally, in voting and value, what is bad for the common is good for the APE. Any APE claim sounding

---

[159] I will not speculate as to what those APE claims based on the events in the complaints could be. But each of them would require demonstrating proof of those additional facts.

Further, certain facts mentioned in the complaint were not advanced as claims or investigated. *See* Izzo Obj. at 31–32 ("This astonishingly broad release would cover not only claims Plaintiff pursued, but potentially: [(i)] Derivative claims related to the Hycroft mine or similar investments made by AMC. They are mentioned in the Complaint, and even if the purchases precede the class period, they 'relate' to class ownership due to the continuous ownership requirement; [(ii)] Derivative challenges to AMC's decision to grant awards under or amend the Company's long-term incentive plan, for the same reasons; . . . ." (footnotes omitted)).

[160] *Supra* note 55.

[161] *E.g.*, *supra* notes 54 and 55.

in voting or value would have to explain why the defendants' actions harmed APE unitholders, when the complaint paints all of those actions as harming common to the benefit of APE. APE claims are not based on the identical factual predicate as Plaintiffs' common claims.

> **2.** **Plaintiffs Cannot Represent Or Release Direct Claims Appurtenant To APE Units Because The APE Units Are A Different Security Than The Common Stock Underpinning The Putative Class.**

APE direct claims require not only proof of different facts than the claims asserted on behalf of the class of common stockholders: APE direct claims are appurtenant to a different security than common stock. APE direct claims can be brought only by APE unitholders. The class of common stockholders cannot release APE claims.

Under Delaware law, direct claims for violating voting rights associated with stock ownership are appurtenant to the share of stock that carries the voting power; they are not personal rights belonging to the stockholder who happens to own the shares.[162] Rights attached to shares include statutory rights under the DGCL and the

---

[162] *Activision*, 124 A.3d at 1049 ("Shares of stock carry with them particular rights that a holder of the shares can exercise by virtue of being the owner. A stockholder can invoke these rights directly, rather than derivatively."); *accord Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668, 677 (Del. 2020) ("The rights in the security are rights 'arising from the relationship among stockholder, stock and the company.' Rights that are personal to the security holder, however, do not travel with the sale of a security. The distinction between rights in the security and personal rights is best illustrated by examples. A corporate charter violation claim travels with a stock sale because the injury 'is to the stock and not the

49

right to enforce a claim for breach of fiduciary duty based on interference with the right to vote.[163]

Any direct claims arising out of the rights appurtenant to the APE units are property rights associated with the APE units. They are not personal rights of the unitholder.[164] APE holders can assert direct claims adhered to APE units because

---

holder.'" (footnotes omitted) (quoting *I.A.T.S.E. Local No. One Pension Fund v. Gen. Elec. Co.*, 2016 WL 7100493, at \*5 (Del. Ch. Dec. 6, 2016), and then citing *Activision*, 124 A.3d at 1050, and then quoting *Schultz v. Ginsburg*, 965 A.2d 661, 667 (Del. 2009), *rev'd on other grounds by Urdan*, 244 A.3d 668))). Plaintiffs' counsel has concisely explained why Franchi can assert common claims under the *Activision* framework. D.I. 537.

[163] *Activision*, 124 A.3d at 1049.

[164] *Id.*; *see also id.* at 1056 ("The foregoing discussion of the direct, derivative, and dual-attribute claims does not mean that an individual holder of shares cannot have personal claims. . . . Quintessential examples of personal claims would include a contract claim for breach of an agreement to purchase or sell shares or a tort claim for fraud in connection with the purchase or sale of shares. One major distinction between these types of claims and the Delaware corporate law claims discussed previously is that for the personal claims, the nature of the underlying property does not matter. The property happens to be shares, but the cause of action is not a property right carried by the shares, nor does it arise out of the relationship between the stockholder and the corporation. For the breach of contract claim, the cause of action arises out of the contract between the buyer and the seller. For the fraud claim, the cause of action arises out of the false representations made by the buyer or seller on which the counterparty relied to her detriment, suffering causally related damages as a consequence. The underlying property could just as easily be land or a car. A Rule 10b–5 claim under the federal securities laws is a personal claim akin to a tort claim for fraud. The right to bring a Rule 10b–5 claim is not a property right associated with shares, nor can it be invoked by those who simply hold shares of stock. It arises only when there has been fraud in connection with the purchase or sale of a security. As such, the Rule 10b–5 claim is personal to the purchaser or seller and remains with that person; it does not travel with the shares. The personal nature of federal securities claims manifests itself in the fact that class certification generally must be obtained under Rule 23(b)(3). By contrast, because Delaware corporate law claims are tied to the shares themselves, they are certified under Rules 23(b)(1) and (b)(2)." (citations omitted)).

they hold APE units.[165]

A common stockholder acting as a representative plaintiff for a class of common stockholders cannot pursue direct APE claims. As explained, Plaintiffs here have been appointed and authorized to bring only those claims that can be brought by common stockholders. Plaintiffs are fiduciaries for the class of common stockholders and only asserted claims seeking to enforce the rights of and remedy the harms to the common. The direct fiduciary and statutory claims Plaintiffs present are appurtenant to shares of common stock.[166] They have nothing to do with the APEs.

Because Plaintiffs are empowered to speak in this putative class action only as and for common stockholders, they cannot represent or release APE direct claims adhered to APE units in this action.[167] Direct APE claims require APE unitholders

---

[165] *See id.* at 1049–50.

[166] *I.A.T.S.E.*, 2016 WL 7100493, at \*5 (citing *In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at \*3 (Del. Ch. Apr. 18, 2001)).

[167] It appears Delaware law would permit the release of personal claims belonging to common stockholders. *Activision*, 124 A.3d at 1058 ("[I]t is theoretically possible that members of the Seller Class might have some personal claims, such as federal securities law claims, that the Settlement releases. The possible existence of those claims does not require a separate class or subclass."); *id.* at 1044.

Objector Alexander Holland interprets *Activision* differently in his exceptions to the Special Master's Report. D.I. 547. The Court has reviewed his exceptions de novo. *Infra* at 63, 65–66. They are dismissed. The Court will proceed with its interpretation of *Activision* as adopted by the Delaware Supreme Court. *E.g.*, *Daniel v. Hawkins*, 289 A.3d 631, 649 n.79 (Del. 2023) (quoting *Urdan v. WR Cap. P'rs, LLC*, 2019 WL 3891720, at

to be part of the class. APE units are not represented in the complaints or in the common stockholder class.

Franchi owns common stock. He does not own any APE units. He plainly cannot represent or release APE claims.[168] Franchi's interests are aligned solely with the common, and he is incented to negotiate on behalf of the common alone. He cannot serve as an adequate fiduciary for APE claims.[169]

While Allegheny is also an APE unitholder, Allegheny is a lead plaintiff only in its capacity as a common stockholder bringing claims adhered to common stock. Allegheny is authorized to serve as a fiduciary only as a common stockholder and for a putative class of other common stockholders. In that capacity as a common stockholder who only asserted class claims appurtenant to the common stock, Allegheny cannot represent or release APE direct claims.

---

*11 (Del. Ch. Aug. 19, 2019), *aff'd*, 244 A.3d 668 (Del. 2020), and then *Activision*, 124 A.3d at 1050).

[168] Hr'g Tr. 80 ("Your question is, if you don't accept – I mean, what you're really saying is if you don't accept the premise that the APEs release just flows with the common, if it's separate, then, yeah, I think – I mean, I wouldn't dispute what you're saying, that we wouldn't give that release."); *id.* at 79–82; *Nat'l Super Spuds*, 660 F.2d at 19 ("In the present case, by contrast, the parties to the settlement have attempted to release claims with respect to which none of them was authorized to represent members of the class.").

[169] *E.g.*, *In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 127 (Del. Ch. 1999) ("In order to meet the adequacy requirements of Rules 23 or 23.1, a representative plaintiff must not hold interests antagonistic to the class . . . ."); *Leon N. Weiner & Assocs., Inc. v. Krapf*, 584 A.2d 1220, 1225 (Del. 1991) ("In an application of the fourth prerequisite of Rule 23(a), the predominant considerations are due process related: (i) that there be no conflict between the named party and the other class members; and (ii) that the named party may be expected to vigorously defend not only themselves but the proposed class.").

Plaintiffs, as fiduciaries for common stockholders, cannot represent or release direct claims appurtenant to APE units. "Having received authority to represent class members solely with respect to [common stock claims], [P]laintiffs ha[ve] no power to release any claims based on any other [securities]."[170]

At the Settlement Hearing, the defendants argued they were "entitled to peace" on the APE claims because "the claims held by APE holders that would be released are personal claims" and "weak in nature."[171] Indeed, *Activision* contemplates that a class settlement can release not only direct and derivative claims adhered to shares, but also directionally consistent personal claims on the same facts held by the holders of those shares, where those personal claims "have not been articulated and are hypothetical at best" and so their release is supported by the same consideration as the meaningful claims.[172] *Activision* explained that personal claims, as for a breach of contract, fraud, or a Rule 10b-5 violation, require facts specific to the person, like reliance, regardless of the underlying property.[173]

---

[170] *Nat'l Super Spuds*, 660 F.2d at 18 (footnote omitted); Ct. Ch. R. 23(a)(3) (requiring "the claims or defenses of the representative parties [to be] typical of the claims or defenses of the class").

[171] Hr'g Tr. 121.

[172] *Activision*, 124 A.3d at 1068.

[173] *Id.* at 1056 ("For the fraud claim, the cause of action arises out of the false representations made by the buyer or seller on which the counterparty relied to her detriment, suffering causally related damages as a consequence. The underlying property could just as easily be land or a car."); *accord Urdan*, 244 A.3d at 677 ("In contrast,

53

The APE claims are distinguishable from the personal claims in *Activision*. First, as explained, APE claims are not based on the same facts as the common claims in this action. Second, the APE claims in the Release encompass not only personal claims carried by the unitholder, but also direct and derivative claims attached to the APE units.[174]

And finally, significantly, and as the next section explains, this case is distinguishable from *Activision* because the proposed settlement consideration cannot support release of APE claims.[175]

---

personal claims do not depend on the relationship between the stockholder and the corporation or the existence of an underlying security.").

[174] Stip. ¶ A.1(r) (releasing claims "arising under federal, state, common, or foreign law, [] whether based on contract, tort, statute, law, equity, or otherwise (including, but not limited to, federal and state securities laws), that Plaintiffs or any other Settlement Class Member: . . . ever had, now have, or hereafter can, shall, or may have, *directly, representatively, derivatively, or in any other capacity* that, in full or part, concern, relate to, arise out of, or are in any way connected to or based upon the allegations, transactions, facts, matters, occurrences, representations, or omissions involved, set forth, or referred to in the Complaints and that relate to the ownership of . . . AMC Preferred Equity Units during the Class Period . . . ." (emphasis added)).

[175] *Activision*, 124 A.3d at 1044 ("Under controlling Delaware Supreme Court precedent, a settlement can release claims of negligible value to achieve a settlement that provides reasonable consideration for meaningful claims." (citing *Phila. Stock Exch.*, 945 A.2d at 1140)).

### 3. The Proposed Settlement Provides No Consideration For Releasing APE Claims.

A release must be supported by consideration to be valid.[176] The Proposed Settlement consideration is detrimental to the APE position; the release of APE claims is therefore not supported by consideration.

As Chancellor Allen observed in *In re Advanced Mammography Systems, Inc. Shareholders Litigation*, a release that purports to release claims held by entities that are differently situated than the plaintiffs (there, derivative claims as compared to the plaintiff's direct claims) "in exchange for no consideration" "would certainly offend fundamental notions of fairness."[177] The Second Circuit reasoned similarly in *National Super Spuds*. There, "[t]he stipulation of settlement provided that members of the class submitting valid claims would divide the settlement proceeds

---

[176] *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 462 (Del. 1999) ("A release is a form of contract with the consideration typically being the surrender of a claim or cause of action in exchange for the payment of funds or surrender or an offsetting claim."); *Cigna Health & Life Ins. Co. v. Audax Health Sols., Inc.*, 107 A.3d 1082, 1088 (Del. Ch. 2014) ("It is the blackest of black-letter law that an enforceable contract requires an offer, acceptance, and consideration. . . . Consideration is a benefit to a promisor or a detriment to a promisee pursuant to the promisor's request." (internal quotation marks omitted) (quoting *James J. Gory Mech. Contracting, Inc. v. BPG Residential P'rs V, LLC*, 2011 WL 6935279, at *2 (Del. Ch. Dec. 30, 2011))); *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 591 n.296 (Del. Ch. May 2, 2023) ("The Court of Chancery has refused to enforce a release in a transmittal letter for lack of consideration." (citing *Cigna*, 107 A.3d at 1091)); *Brinckerhoff v. Tex. E. Prod. Pipeline Co., LLC*, 986 A.2d 370, 385 (Del. Ch. 2010) ("[A] reviewing court can and should question how much consideration was provided for the release that blesses the transaction and exonerates the defendants.").

[177] 1996 WL 633409, at *1.

in proportion to the number of contracts they had liquidated at a loss."[178]  "Persons in Richards'[s] position," who held both liquidated and unliquidated contracts, "were thus to release claims based on both liquidated and unliquidated contracts in return for payments that were to be determined solely on the basis of the contracts they had liquidated."[179]  The Second Circuit held "[t]here is no justification for requiring Richards or persons similarly situated to release claims based on unliquidated contracts as part of a settlement in which payments to class members are to be determined solely on the basis of the contracts they liquidated."[180]

Here, the Proposed Settlement compensates common stockholders to the exclusion—and dilution—of APE unitholders.  The settlement consideration offers common stockholders more AMC equity, which necessarily comes at the expense of the APE position.[181]  The parties propose to pay that consideration after the

---

[178] *Nat'l Super Spuds*, 660 F.2d at 14.

[179] *Id.*

[180] *Id.* at 18 (footnote omitted).

[181] Indeed, an APE unitholder moved to intervene in this action to protect his APE position from the settlement consideration.  D.I. 346; *id.* at 3 (asserting that he purchased APE units "reasonably relying on the Company's promises" of a one-for-one conversion, and that the proposed settlement will dilute his APE units and "deprive [him] of the benefit of his bargain").  The Special Master recommended the Court deny his motion concluding the APE unitholder "does not have an interest at risk in the action because he is not a member of the class and 'is free to pursue [his] claims . . . elsewhere. . . . [E]ven if he did have an interest at risk in the action, that interest is based on a collateral, indirect impact of the action rather than the claims asserted in the action.  I do not view that as a sufficient basis to permit [the unitholder] to intervene as of right.'"  D.I. 536 at 4 (quoting *Marie Raymond Revocable Tr. v. MAT Five LLC*, 980 A.2d 388, 398 (Del. Ch. 2008), *aff'd sub nom.*

Reverse Split, but before the Conversion.[182]  In that scenario, when the APEs convert to shares of common stock, former APE unitholders will represent a smaller percentage of the total common than they would have if not for the Proposed Settlement consideration received by the class.[183]  The release of APE claims is not supported by consideration.

### 4.     No Objector Raised The APE Claim Release, And No Party Demonstrated Its Reasonableness.

No putative class member raised the Release's problematic mechanics in encompassing APE claims.[184]  Neither the Special Master nor Plaintiffs indicated objectors raised the inclusion of APE claims in the Release as an issue with the Proposed Settlement.[185]  Izzo, who as noted holds more APE units than common

---

*Whitson v. Marie Raymond Revocable Tr.*, 976 A.2d 172 (Del. 2009), and then citing *In re AMC Entm't Hldgs., Inc. S'holder Litig.*, 2023 WL 2518479, at *4 (Del. Ch. Mar. 15, 2023)).  She also recommended the Court deny permissive intervention because the unitholder "is not part of that class of stockholders, and intends to intervene for the purpose of protecting his economic interest in the value of his APE units.  [He] has no interest in the merits of the plaintiffs' claims." *Id.* at 5 (footnotes and internal quotation marks omitted).

[182] Stip. ¶ A.1(y).

[183] POB at 30–31 (explaining how the proposed settlement consideration improves the Class's position at the expense of the APEs).

[184] The Court gave de novo and specific review to 310 objections that raised the topic of the release or "immunity" for the defendants.  Brian Tuttle, who did not submit a compliant objection, raised the inclusion of the APE claims in the Release in an untimely second set of objections filed on July 3, after the Court raised the issue at the Settlement Hearing. *Infra* note 204.

[185] Rpt. at 73–75; PRB at 38–41.

shares, is represented by competent counsel. She asserted the Release improperly released future claims and others, but did not raise the release of APE claims as a fault in the Proposed Settlement.[186] The other compliant objections did not object to the release of the APE claims.[187] For example, while the "Form Objection" argued the Release improperly applied to potential claims belonging to former AMC stockholders, it did not address the released APE claims.[188] Perhaps this is because the class interests as common stockholders are adverse.

The Special Master identified the fact that "the Stipulation provides for Class members to release claims 'that relate to the ownership of Common Stock and/or AMC Preferred Equity Units during the Class Period'" as a reason why the Court

---

[186] Izzo Obj. at 30–34. Rather, Izzo argued the Release improperly releases tangential and future claims, while the parties assert the scope of the release is "appropriate" and "typical." *Id.*; PRB at 38–41; DRB at 19–24. Izzo argues the Release encompasses claims "that could arise based on a future event," citing the language in the Release that it applies to any claim settlement class members "ever had, now have, or hereafter can, shall, or may have." Izzo Obj. at 31, 33. This reading misinterprets the Release. The language Izzo cites is subject to two conjunctive limitations: (i) the claim must be "connected to or based upon the allegations, transactions, facts, matters, occurrences, representations, or omissions involved, set forth, or referred to in the Complaints;" and (ii) the claim must "relate to the ownership of" AMC equity "during the Class Period." Stip. ¶ A.1(r). These two limitations make clear the Release does not apply to future events.

[187] One noncompliant objection did object to the Release releasing the Settlement Class members' individual claims—as opposed to derivative claims—without adequate consideration, citing *Activision*. PRB, Ex. 11 (attaching Brian Tuttle's objection); D.I. 529, Ex. EE (same); *see also* D.I. 533; D.I. 573. Tuttle did not address the Release's inclusion of APE claims.

[188] PRB, Ex. 3, Form Objection, at 14–15.

should "consider that some Class members own APE units received through the dividend" when weighing the value of the "give" against the "get."[189]

I raised the fact that the Release included APE claims released by common stockholders at argument to Plaintiffs and the defendants.[190] Plaintiffs' counsel first tried to describe the APEs as a share split to color the APE claims as appurtenant to the common shares, then deferred to the defendants' counsel, and then wondered aloud if the defendants would drop that part of the Release.[191] The defendants' counsel simply insisted they were "entitled to complete peace."[192] As explained,

---

[189] Rpt. at 38–39.

[190] Hr'g Tr. 68 ("[THE COURT:] Why does the release include APE claims, and how can the class reach those if the class is common?"); *id.* at 70 ("THE COURT: How does that work under *Activision*?'"); *id.* at 79 ("THE COURT: Do you have a theory as to how Mr. Franchi, who doesn't own any APE, can be a fiduciary for APE claims included in the release?"); *id.* at 127 ("THE COURT: Can you address the fact that the APE claims -- again, I certainly don't want to be the one to speculate what they might be, but certainly what we know is that the APE interests, when it comes to voting, are divergent from common interests when it comes to voting, which is what the claims were about in the complaint. ATTORNEY NEUWIRTH: Right. THE COURT: Can you address why it would be appropriate and commensurate with due process to release those divergent claims here?").

[191] *Id.* at 79 ("[ATTORNEY LEBOVITCH:] Again, we weren't giving a release for completely unrelated securities. Like, it wasn't an all-securities release, which, again, is done in federal court in other contexts. We're not doing it here, and in Delaware we're not giving an all-securities release. It was an AMC common share release. And whether you think of it as the APEs are literally a splitting of the common share or not, that's the way it was presented. We felt that it was reasonable legally. But ultimately, it's a negotiated term, and maybe Mr. Neuwirth, you know, can understand it better. But it didn't seem unreasonable to us at all."); *id.* at 83 ("And -- if -- if defendants were willing to do a deal without the APEs release, we'd say fine.").

[192] *Id.* at 128; *see also id.* at 119 ("And in return for the settlement of those claims, and the consideration that we're providing to the class, like any defendant, we want complete

59

releasing APE claims in this Proposed Settlement is not possible based on the class composition and proposed consideration.

I will not speculate or hazard to guess what APE claims a class member who also owns APE, in their capacity as an APE unitholder, might bring, or what risk such claims might present to the Company. The parties bear the burden of demonstrating that the Proposed Settlement is fair, reasonable, and in accordance with due process.[193] It is up to the parties to decide if the risk of unreleased APE claims is worth rejection of a settlement that might pave the way for the Conversion,

---

peace."); *id.* at 121 ("But, nevertheless, we think we're entitled to peace on those claims . . . ."); *id.* at 122 ("And I think this is, by the way, part of the reason why it's fair to release these claims, is that we do want peace with respect to APE claims for members of the class."); *id.* at 128 ("And I think, given the consideration that we're paying to common stockholders and given that the thrust of this whole lawsuit is that APEs are benefiting at the expense of the common, I think we're entitled to complete peace. And I think that -- I think Delaware law recognizes that, that when defendants are providing what we think is more than adequate consideration, we are entitled to that kind of peace for issues arising out of the complaint and facts and circumstances relating to the complaint."); *id.* at 129 ("[ATTORNEY NEUWIRTH:] And we think we're entitled to peace from all of that in return for the proposed consideration that we've offered. THE COURT: Given that the proposed consideration is meant to improve the lot of the common, how does it serve as consideration for the APE claims? ATTORNEY NEUWIRTH: I don't think it is, necessarily, consideration for the APE claims. But I think *Activision* permits us to get peace with respect to those types of personal claims that may be weak, notwithstanding that. So the APE holders are not receiving -- I mean, they're receiving consideration wearing their common stockholder hat, to the extent that they're both, but they're not receiving consideration on their APE shares.").

[193] *TD Banknorth*, 938 A.2d at 658 n.4 (citing *First Boston, Inc*, 1990 WL 78836, at *9).

which the parties have intimated is necessary to save the Company from financial ruin.[194]

## B. Objections And Exceptions To The Special Master's Report

Though I conclude I cannot approve the Proposed Settlement, I want to take this opportunity to address the Special Master's Report and the exceptions to it. The Court is grateful to the Special Master and her team, who devoted unbiased expertise and many hours to give prompt and careful attention to the numerous motions and nearly 2,000 compliant and noncompliant objections that were received from putative stockholders (the "Objections").[195] The Special Master recommended that her fee be split evenly between the parties; no exception was taken to that

---

[194] *E.g.*, DOB at 7–8 ("Given AMC's financial condition, AMC's 'current cash burn rates are not sustainable,' and there are no guarantees that AMC will be successful in generating the liquidity necessary to meet its financial obligations beyond 2023. As AMC reported earlier this year, while the Company had approximately $631.5 million of cash on hand as of December 31, 2022, its cash position deteriorated by approximately $961 million in 2022, despite raising approximately $220.4 million from the sale of APEs in 2022. Unless revenue and attendance levels rise, the failure to obtain additional liquidity through equity capital would likely result in bankruptcy, in which holders of Common Stock and APEs would likely suffer a total loss of their investment." (footnotes omitted)); Hr'g Tr. 86 ("[ATTORNEY LEBOVITCH:] We understand that if this company is facing imminent failure, whether or not we could prove a claim, we don't want to ask the Court to throw a company into bankruptcy.").

I asked Plaintiffs' counsel to point the Court to a document in the discovery record that convinced them the Company was facing imminent bankruptcy if the Proposals were not enacted. They did not. *Id.* at 93–96.

[195] D.I. 567, Appendix A [hereinafter "Am. Appendix A"] (listing "Timely Objections With Proof of Ownership"); D.I. 567, Appendix B [hereinafter "Am. Appendix B"] (listing "Timely Objections Without Proof of Ownership"); Rpt. at Appendix C (listing "Untimely Objections").

recommendation, and I adopt it de novo. The Special Master should submit an affidavit for Court approval.[196]

Stockholders objecting to the Proposed Settlement were required to submit a written objection that complied with the requirements set forth in the Notice, the Scheduling Order, and the Court's May 3 Letter.[197] To be compliant, an Objection must have been (1) submitted in writing to Plaintiffs' counsel, (2) received by May 31, 2023, and (3) accompanied by proof that the objector was the record or beneficial owner of AMC common stock at the relevant time.[198]

Approximately half the communications submitted by purported stockholders did not include any information regarding their holdings.[199] In accordance with the May 3 Letter, the Special Master considered the subset of Objections that were accompanied by proof of stock ownership.[200] Amended Appendix A to the Special Master's Report lists the 1,445 Objections submitted between May 1 and May 31,

---

[196] D.I. 149 ¶ 7; Ct. Ch. R. 88.

[197] Notice ¶¶ 63–70; Sched. Ord. ¶¶ 18–19; May 3 Ltr. at 2, 4.

[198] Notice ¶¶ 63–66, 69; Sched. Ord. ¶¶ 18–19; May 3 Ltr. at 2.

[199] PRB at 8.

[200] Rpt. at 22; *see also* May 3 Ltr. at 2 ("Objections must be accompanied by documentary evidence of beneficial ownership of AMC common stock. Such evidence must show the stockholder's full name and can comprise copies of an official brokerage account statement, a screen shot of an official brokerage account, or an authorized statement from the stockholder's broker containing the transactional and holding information found in an account statement."). As set forth in the May 3 Letter, exceptions must have been received on or before June 28 to be considered timely. *Id.* at 3.

2023 that provided some form of proof of AMC common stock ownership.[201]  As reflected in the Report, the Special Master concluded that none of the compliant Objections raised issues warranting a denial or modification of the Proposed Settlement.[202]  Because I find the inclusion of APE claims in the Release dispositive, and because no compliant Objection raised the issue of APE claims being included in the Release, the compliant Objections do not inform my decision.[203]

Thirteen exceptions to the Report were timely filed; nine were compliant.[204]

---

[201] All documents identified in Appendices A through F to the Special Master's Report were delivered to the Court on June 22, 2023.  The documents identified in Amended Appendices A and B are not new, just recategorized.  Am. Appendix A; Am. Appendix B.

Few stockholders complied with all of the ownership requirements to submit a compliant Objection.  *See* Notice ¶ 64; Sched. Ord. ¶ 19.  Despite that, if a stockholder made a good faith effort to submit some form of proof of ownership of AMC common stock, I deemed the Objection compliant.  Likewise, a few stockholders at the end of Amended Appendix A did not utilize their actual name.  I still considered these Objections, but they did not affect my analysis.

[202] Rpt. at 87.

[203] *E.g.*, *In re Cent. Banking Sys., Inc.*, 1993 WL 410421, at *2 n.2 (Del. Ch. Oct. 6, 1993) ("Rafton objected on other grounds as well, but those grounds are not relevant to the issue being decided here."); *Goldman v. Aegis Corp.*, 1982 WL 525016, at *2–3 (Del. Ch. May 3, 1982) (objections based on issues "not before [the] [c]ourt" are "without merit"); *cf. Trulia*, 129 A.3d at 907 n.90 ("Because I reject the proposed settlement, I do not address the issue of class certification, although stockholder classes in cases such as this are typically certified.").

[204] D.I. 533 (Brian Tuttle); D.I. 573 (same); D.I. 546 (Douglas Miller); D.I. 547 (Alexander Holland); D.I. 541 (same); D.I. 580 ¶ 7; D.I. 552 (Howard Chen); D.I. 553 (Slwormir Sochur); D.I. 554 (Magdalena Georgopoulos); D.I. 556 (Roze Izzo); D.I. 558 (Samer Kurait); D.I. 559 (same); D.I. 560 (Leta Anderson and Emily Anderson); D.I. 564 (Plaintiffs); D.I. 565 (Karen Grelish); D.I. 566, Ex. A (Fonda Furtivo); D.I. 566, Ex. B (John Hartranett).

I do not consider Furtivo or Hartranett's exceptions because they did not submit them to the Court. May 3 Ltr. at 3 (requiring all exceptions be submitted to the Court and not to Plaintiffs' counsel).

Submissions styled as "exceptions" filed by individuals who did not submit a compliant objection will not be considered. Sched. Ord. ¶ 20; Notice ¶ 69; May 3 Ltr. at 3. For this reason, I do not consider the exceptions submitted by Grelish or Tuttle.

While Plaintiffs catalogued Grelish's submission as a compliant Objection, the Special Master catalogued Grelish's submission as an inquiry. D.I. 509, Third Revised Transmittal Affidavit of Michael J. Barry Providing Log of Stockholder Communications, Ex. B; Rpt. at Appendix F, no. 702. Reviewing Grelish's submission de novo, I conclude it is neither compliant nor an Objection because it lacks proof of ownership and does not object to the settlement, but rather informs Plaintiffs that Grelish had not received a postcard.

On July 3, 2023, after the Court raised the inclusion of APE claims in the release at the Settlement Hearing, Tuttle filed either a second set of exceptions, or a brief in support of his exceptions, that mentions this issue. D.I. 573. I will not consider Tuttle's July 3 filing for two reasons. First, Tuttle failed to comply with the requirements for submitting a valid Objection. Tuttle argued that the Special Master erred by declining to consider his Objection because he failed to include proof of stock ownership in a form authorized by the Court's May 3 Letter. D.I. 533 ¶¶ 2.a–c. While conceding he did not attach compliant proof of ownership, he argues that the Special Master should have considered his Objection because he filed a pro se affidavit on May 9 stating he held AMC common stock at the relevant time. D.I. 253 ¶ 7. The Special Master was correct not to consider that affidavit and the Objection.

To be sure, requiring strict compliance with procedures for submitting objections is the exception in this Court. *Activision*, 124 A.3d at 1062 ("Experience demonstrates that objecting stockholders are not sticklers about complying with the procedures for filing objections, and the court generally considers objections on the merits. '[I]n the absence of resulting prejudice to other participants, the Court's general practice has been to hear and consider all such objections and to deal with them substantively, notwithstanding the objector's failure to comply with the letter of the notice.'" (alteration in original) (quoting Donald Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.04[d] at 9-192 (2012))); 2 Wolfe & Pittenger § 13.03[d] at 13-24 (same). But this case posed unique administrative challenges prompted by a large and highly engaged retail stockholder base. The Court implemented the objection filing requirements in the May 3 Letter in anticipation of purported stockholders filing an extraordinary number of objections to the Proposed Settlement. The administrative challenges of intaking and reviewing so many objections required baseline standards and adherence to them. Other class action or derivative settlement approval proceedings have

I have reviewed each compliant exception de novo.[205] The exceptions touch on a range of issues, including but not limited to: the adequacy of the notice, with a focus on postcard notice;[206] the strength of the claims and the value of the claims being released, or the "give" as compared to the "get";[207] the Special Master's categorization of some purported stockholder correspondence as "inquiries";[208] the

---

not needed such measures. But here, the Special Master was correct in declining to consider Tuttle's Objection because it was not accompanied by proof of ownership as required by the Court. I will not consider the Tuttle exceptions.

Second, even if Tuttle had filed a compliant Objection, the July 3 exceptions are untimely. Sched. Ord. ¶ 23 ("The Parties may file any exceptions to the Special Master's Report and Recommendation no later than June 28, 2023."); May 3 Ltr. at 3 ("Exceptions must be received and docketed by June 28, 2023 for the Court to consider them." (emphasis omitted)).

[205] *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999); *see also Aveta, Inc. v. Colon*, 942 A.2d 603, 607 (Del. Ch. 2008) ("When considering objections to a master's report, this Court reviews *de novo* the master's legal and factual conclusions. Where, as here, neither party takes exception to any of the master's factual findings, the Court 'may review the record *de novo* accepting the master's facts in the same way that the judge would resolve a dispute presented on a stipulated set of facts.'" (quoting *DiGiacobbe*, 743 A.2d at 184, and citing *Sutherland v. Dardanelle Timber Co.*, 2006 WL 1451531, at *7 (Del. Ch. May 16, 2006), and *DiGiacobbe*, 743 A.2d at 184, and *Dolan v. Villages of Clearwater Homeowner's Ass'n, Inc.*, 2005 WL 2810724, at *1 (Del. Ch. Oct. 21, 2005))).

[206] *See, e.g.*, D.I. 553 ¶ 6; D.I. 560; D.I. 565 at 4; D.I. 566, Ex. B at 2, 5.

[207] *See, e.g.*, D.I. 546 at 4; D.I. 547 ¶¶ 2–13; D.I. 556 at 10–28; D.I. 558; D.I. 560; D.I. 565 at 5–9; D.I. 566, Ex. A ¶¶ 3–4; D.I. 566, Ex. B at 6–7.

[208] D.I. 552 at 2; D.I. 566, Ex. B at 2. Both Howard Chen and John Hartranett filed exceptions on this basis. The original appendix to the Special Master's report listed Chen's objection as an "inquiry." Rpt. at Appendix F, no. 320. The Special Master recategorized Chen's submission as a compliant Objection in a June 28 revised appendix. Rpt. at Am. Appendix A, no. 211. The Special Master explained that "[n]one of these changes impact [her] analysis or alter [her] recommendation and all of the files and records that [she] previously provided to the Court remain accurate and properly labeled." D.I. 567 at 2.

Special Master's decision to give little weight to the volume of objections;[209] Plaintiffs' counsel's fee award;[210] and whether the Special Master adequately reviewed and assessed each Objection.[211]  As stated above, I rejected the Proposed Settlement because the agreement releases APE claims in a representative action by and for common stockholders.  Though a handful of the exceptions focus on the scope of the release, no compliant exception raised this particular issue.  The pending exceptions do not inform the basis for my opinion, and so I need not reach them.  Nevertheless, I will briefly address one specific concern.

Multiple objectors filed exceptions asserting that the Special Master could not have considered all the compliant Objections, based on their extraordinary volume and the limited time she had to review them and draft her report.[212]  These concerns are unfounded.  Plaintiffs' counsel liberally categorized stockholder correspondence as "objections," including emails and letters stating only a desire to opt out of the

Indeed, the Special Master's report engages with Chen's Objection several times in the footnotes, showing that it was in fact considered.  Rpt. at 58 n.175, 72 n.234, 83 n.274.

Hartranett is listed in the original appendix as having submitted both a Compliant Objection and an inquiry.  Rpt. at Appendix A, no. 477; Rpt. at Appendix F, no. 761.  The revised appendix lists him as having submitted a compliant Objection.  Rpt. at Am. Appendix A, no. 508.  Although the Special Master did not expressly address his Objection, there is no indication that she evaluated it as an inquiry rather than an Objection.

[209] *See, e.g.*, D.I. 547 ¶ 14; D.I. 556 at 28–32; D.I. 565 at 5.

[210] *See, e.g.*, D.I. 556 at 38–42.

[211] *See, e.g.*, D.I. 547 ¶ 16; D.I. 553 ¶¶ 1, 5; D.I. 560; D.I. 565 at 4–5; D.I. 566, Ex. A ¶ 5.

[212] *See, e.g.*, D.I. 547 ¶¶ 17–18.

settlement.[213]  Many Objections were only a few sentences.[214]  The Special Master

could address these submissions quickly.  Many objections assert the same themes,

allowing the Special Master to address them as a group.[215]  Many themes were

previewed in stockholder correspondence on the docket that predated formal

Objections.[216]  The Special Master received the Objections on a rolling basis.  And

the Special Master led a team:  the April 25 order appointing the Special Master

expressly authorized her to "make use of partners, counsel, associates, and support

staff within her firm."[217]  Exceptions asserting the Special Master failed to give each

Objection due attention are dismissed.

---

[213] This is not a criticism of Plaintiffs' counsels' handling of the Objections; Plaintiffs' counsel were correct to err on the side of categorizing such correspondence as Objections to ensure the Special Master had the widest possible scope of review.

[214] Because the May 3 Letter contemplated sending Objections directly to Plaintiffs' counsel, the objectors do not have access to each other's Objections unless they were filed by Plaintiffs or shared online.  D.I. 527; D.I. 528; D.I. 529; D.I. 545; Rpt. at 24–25.

[215] The order appointing the Special Master expressly permitted her to do so.  D.I. 149 ¶ 2. *See* Rpt. at 24–25 ("Many stockholders submitted community or 'form' Objections that were disseminated widely online. . . .  Plaintiffs also state that Bubbie Gunter used ChatGPT to develop a community form . . . .  Finally, various Objectors submitted what appears to be a community form submitted by Frank Maribito.  This form is similar, but not identical to the Bubbie Gunt[]er ChatGPT form.").

[216] *See, e.g.*, *supra* note 76.

[217] D.I. 149 ¶ 4.

## III. CONCLUSION

For the foregoing reasons, the Proposed Settlement is not approved. The parties should confer on and submit a schedule for the remainder of the case, and Plaintiffs should file a consolidated complaint.